INSURANCE CORPORATION OF IRELAND, LTD.,
ET AL. *v.* COMPAGNIE DES BAUXITES DE GUINEE

No. 81–440.   Argued March 23, 1982—Decided June 1, 1982

WHITE, J., delivered the opinion of the Court, in which BURGER, C. J., and BRENNAN, MARSHALL, BLACKMUN, REHNQUIST, STEVENS, and O'CONNOR, JJ., joined. POWELL, J., filed an opinion concurring in the judgment, *post*, p. 709.

*Edmund K. Trent* argued the cause for petitioners. With him on the briefs was *Thomas P. Lawton III*.

*Cloyd R. Mellott* argued the cause for respondent. With him on the brief were *Dale Hershey, Robert W. Doty, Robert L. Byer*, and *Jordan S. Weltman*.

JUSTICE WHITE delivered the opinion of the Court.

Rule 37(b), Federal Rules of Civil Procedure, provides that a district court may impose sanctions for failure to comply with discovery orders. Included among the available sanctions is:

> "An order that the matters regarding which the order was made or any other designated facts shall be taken to be established for the purposes of the action in accordance with the claim of the party obtaining the order." Rule 37(b)(2)(A).

The question presented by this case is whether this Rule is applicable to facts that form the basis for personal jurisdiction over a defendant. May a district court, as a sanction for failure to comply with a discovery order directed at establishing jurisdictional facts, proceed on the basis that personal jurisdiction over the recalcitrant party has been established?

Petitioners urge that such an application of the Rule would violate due process: If a court does not have jurisdiction over a party, then it may not create that jurisdiction by judicial fiat.[1] They contend also that until a court has jurisdiction over a party, that party need not comply with orders of the court; failure to comply, therefore, cannot provide the ground for a sanction. In our view, petitioners are attempting to create a logical conundrum out of a fairly straightforward matter.

## I

Respondent Compagnie des Bauxites de Guinee (CBG) is a Delaware corporation, 49% of which is owned by the Republic of Guinea and 51% is owned by Halco (Mining) Inc. CBG's principal place of business is in the Republic of Guinea, where it operates bauxite mines and processing facilities. Halco, which operates in Pennsylvania, has contracted to perform certain administrative services for CBG. These include the procurement of insurance.

In 1973, Halco instructed an insurance broker, Marsh & McLennan, to obtain $20 million worth of business interruption insurance to cover CBG's operations in Guinea. The first half of this coverage was provided by the Insurance Company of North America (INA). The second half, or what is referred to as the "excess" insurance, was provided by a group of 21 foreign insurance companies,[2] 14 of which are petitioners in this action (the excess insurers).[3]

---

[1] The petition with which we deal in this case was filed as a cross-petition in response to the petition for certiorari filed in No. 81–290, *Compagnie des Bauxites de Guinee v. Insurance Corp. of Ireland, Ltd.* We granted the cross-petition, limiting the grant to the question of the validity of the Rule 37(b)(2) sanction. 454 U. S. 963 (1981). We shall refer to the cross-petitioners as "petitioners" and to the cross-respondent as "respondent."

[2] The District Court described these excess insurers as follows:

"Of the 21 Excess Insurers, five are English companies representing English domestic interests but insuring risks throughout the world, partic-

Marsh & McLennan requested Bland Payne to obtain the excess insurance in the London insurance market. Pursuant to normal business practice

> "[i]n late January and in February, 1974, Bland Payne presented to the excess insurer [petitioners] a placing slip in the amount of $10,000,000, in excess of the first $10,000,000. [Petitioners] initialed said placing slip, effective February 12, 1974, indicating the part of said $10,000,000 each was willing to insure."[4] Finding 27 of the District Court, 2 App. 347a.

Once the offering was fully subscribed, Bland Payne issued a cover note indicating the amount of the coverage and specifying the percentage of the coverage that each excess insurer had agreed to insure. No separate policy was issued; the excess insurers adopted the INA policy "as far as applicable."

Sometime after February 12, CBG allegedly experienced mechanical problems in its Guinea operation, resulting in a business interruption loss in excess of $10 million. Contending that the loss was covered under its policies, CBG brought suit when the insurers refused to indemnify CBG for the loss. Whatever the mechanical problems experienced by CBG, they were perhaps minor compared to the legal difficulties encountered in the courts.

---

ularly in Pennsylvania. Seven are English companies which represent non English parents, or affiliates. The United States, Japan and Israel are the nationalities of two each of the Excess Insurer Defendants. Switzerland and the Republic of Ireland are the nationalities of one each of the Excess Insurer Defendants. The remaining Excess Insurer Defendant is a Belgium Company which represents the United States parent." 1 App. 196a.

[3] Four of the excess insurers did not contest personal jurisdiction in the District Court. *Id.*, at 105a. The Court of Appeals directed the dismissal of the complaint with respect to three others. *Compagnie des Bauxites de Guinee* v. *Insurance Co. of North America,* 651 F. 2d 877, 886 (1981). CBG challenges the latter action in its petition for certiorari in No. 81–290.

[4] One of the excess insurers, L'Union Atlantique S.A. d'Assurances, does business in Brussels, and was sent a separate placing slip.

In December 1975, CBG filed a two-count suit in the Western District of Pennsylvania, asserting jurisdiction based on diversity of citizenship. The first count was against INA; the second against the excess insurers. INA did not challenge personal or subject-matter jurisdiction of the District Court. The answer of the excess insurers, however, raised a number of defenses, including lack of *in personam* jurisdiction. Subsequently, this alleged lack of personal jurisdiction became the basis of a motion for summary judgment filed by the excess insurers.[5] The issue in this case requires an account of respondent's attempt to use discovery in order to demonstrate the court's personal jurisdiction over the excess insurers.

Respondent's first discovery request—asking for "[c]opies of all business interruption insurance policies issued by Defendant during the period from January 1, 1972 to December 31, 1975"—was served on each defendant in August 1976. In January 1977, the excess insurers objected, on grounds of burdensomeness, to producing such policies. Several months later, respondent filed a motion to compel petitioners to produce the requested documents. In June 1978, the court orally overruled petitioners' objections. This was followed by a second discovery request in which respondent narrowed the files it was seeking to policies which "were delivered in . . . Pennsylvania . . . or covered a risk located in . . . Pennsylvania." Petitioners now objected that these documents were not in their custody or control; rather, they were kept by the brokers in London. The court ordered petitioners to request the information from the brokers, limiting the request to policies covering the period from 1971 to date. That was in July 1978; petitioners were given 90 days to produce the information. On November 8, petitioners

---

[5] The motion for summary judgment was filed on May 20, 1977. In it, 17 of the excess insurers alleged a lack of *in personam* jurisdiction and all 21 excess insurers sought dismissal on the ground of *forum non conveniens*. The District Court denied the motion on April 19, 1979.

were given an additional 30 days to complete discovery. On November 24, petitioners filed an affidavit offering to make their records, allegedly some 4 million files, available at their offices in London for inspection by respondent. Respondent countered with a motion to compel production of the previously requested documents. On December 21, 1978, the court, noting that no conscientious effort had yet been made to produce the requested information and that no objection had been entered to the discovery order in July, gave petitioners 60 more days to produce the requested information. The District Judge also issued the following warning:

> "[I]f you don't get it to him in 60 days, I am going to enter an order saying that because you failed to give the information as requested, that I am going to assume, under Rule of Civil Procedure 37(b), subsection 2(A), that there is jurisdiction." 1 App. 115a.

A few moments later he restated the warning as follows: "I will assume that jurisdiction is here with this court unless you produce statistics and other information in that regard that would indicate otherwise." *Id.*, at 116a.

On April 19, 1979, the court, after concluding that the requested material had not been produced, imposed the threatened sanction, finding that "for the purpose of this litigation the Excess Insurers are subject to the in personam jurisdiction of this Court due to their business contacts with Pennsylvania." *Id.*, at 201a. Independently of the sanction, the District Court found two other grounds for holding that it had personal jurisdiction over petitioners. First, on the record established, it found that petitioners had sufficient business contacts with Pennsylvania to fall within the Pennsylvania long-arm statute. Second, in adopting the terms of the INA contract with CBG—a Pennsylvania insurance contract—the excess insurers implicitly agreed to submit to the jurisdiction of the court.[6]

---

[6] On March 22, 1979, the excess insurers instituted a suit against CBG in England, attacking the validity of the insurance contract. In its April 19 deci-

Except with respect to three excess insurers, the Court of Appeals for the Third Circuit affirmed the jurisdictional holding, relying entirely upon the validity of the sanction.[7] *Compagnie des Bauxites de Guinea* v. *Insurance Co. of North America,* 651 F. 2d 877 (1981). That court specifically found that the discovery orders of the District Court did not constitute an abuse of discretion and that imposition of the sanction fell within the limits of trial court discretion under Rule 37(b):

> "The purpose and scope of the ordered discovery were directly related to the issue of jurisdiction and the rule 37 sanction was tailored to establish as admitted those jurisdictional facts that, because of the insurers' failure to comply with discovery orders, CBG was unable to adduce through discovery." 651 F. 2d, at 885.

Furthermore, it held that the sanction did not violate petitioners' due process rights, because it was no broader than "reasonably necessary" under the circumstances.

Because the decision below directly conflicts with the decision of the Court of Appeals for the Fifth Circuit in *Familia de Boom* v. *Arosa Mercantil, S.A.,* 629 F. 2d 1134 (1980), we granted certiorari.[8] 454 U. S. 963 (1981).

---

sion, the District Court found that "the commencement of the separate action in England [was] oppressive, unfair, and an act of bad faith under all of the circumstances." 1 App. 203a. It, therefore, enjoined the continuation of that suit. This aspect of the District Court decision was reversed by the Court of Appeals. Respondent seeks certiorari review of that decision (see n. 1, *supra*).

[7] It reversed as to three of the excess insurers on the grounds that they had complied with the discovery orders and that their contacts with Pennsylvania were not sufficient to justify exercise of the Pennsylvania long-arm statute. It also held that the District Court had abused its discretion in enjoining the action in England. Judge Gibbons dissented on the propriety of the sanction, arguing that the District Court had abused its discretion. He also expressed some doubt that a Rule 37 sanction could ever be used as the source of personal jurisdiction. 651 F. 2d, at 892, n. 4.

[8] In *Familia de Boom,* the Fifth Circuit held that a sanction under Rule 37(b)(2) is valid only if the court has personal jurisdiction over the party

## II

In *McDonald* v. *Mabee*, 243 U. S. 90 (1917), another case involving an alleged lack of personal jurisdiction, Justice Holmes wrote for the Court, "great caution should be used not to let fiction deny the fair play that can be secured only by a pretty close adhesion to fact." *Id.*, at 91. Petitioners' basic submission is that to apply Rule 37(b)(2) to jurisdictional facts is to allow fiction to get the better of fact and that it is impermissible to use a fiction to establish judicial power, where, as a matter of fact, it does not exist. In our view, this represents a fundamental misunderstanding of the nature of personal jurisdiction.

The validity of an order of a federal court depends upon that court's having jurisdiction over both the subject matter and the parties. *Stoll* v. *Gottlieb*, 305 U. S. 165, 171–172 (1938); *Thompson* v. *Whitman*, 18 Wall. 457, 465 (1874). The concepts of subject-matter and personal jurisdiction, however, serve different purposes, and these different purposes affect the legal character of the two requirements. Petitioners fail to recognize the distinction between the two concepts—speaking instead in general terms of "jurisdiction"—although their argument's strength comes from conceiving of jurisdiction only as subject-matter jurisdiction.

Federal courts are courts of limited jurisdiction. The character of the controversies over which federal judicial authority may extend are delineated in Art. III, § 2, cl. 1. Jurisdiction of the lower federal courts is further limited to those subjects encompassed within a statutory grant of jurisdiction. Again, this reflects the constitutional source of federal judicial power: Apart from this Court, that power only

---

that has refused compliance with a court order. Personal jurisdiction must, it held, appear from the record independently of the sanction. The Courts of Appeals for the Fourth and Eighth Circuits, on the other hand, have agreed with the Third Circuit on the appropriateness of a sanction on the issue of personal jurisdiction. *Lekkas* v. *Liberian M/V Caledonia*, 443 F. 2d 10, 11 (CA4 1971); *English* v. *21st Phoenix Corp.*, 590 F. 2d 723 (CA8 1979).

exists "in such inferior Courts as the Congress may from time to time ordain and establish." Art. III, § 1.

Subject-matter jurisdiction, then, is an Art. III as well as a statutory requirement; it functions as a restriction on federal power, and contributes to the characterization of the federal sovereign. Certain legal consequences directly follow from this. For example, no action of the parties can confer subject-matter jurisdiction upon a federal court. Thus, the consent of the parties is irrelevant, *California* v. *LaRue*, 409 U. S. 109 (1972), principles of estoppel do not apply, *American Fire & Casualty Co.* v. *Finn*, 341 U. S. 6, 17–18 (1951), and a party does not waive the requirement by failing to challenge jurisdiction early in the proceedings. Similarly, a court, including an appellate court, will raise lack of subject-matter jurisdiction on its own motion. "[T]he rule, springing from the nature and limits of the judicial power of the United States is inflexible and without exception, which requires this court, of its own motion, to deny its jurisdiction, and, in the exercise of its appellate power, that of all other courts of the United States, in all cases where such jurisdiction does not affirmatively appear in the record." *Mansfield, C. & L. M. R. Co.* v. *Swan*, 111 U. S. 379, 382 (1884).[9]

None of this is true with respect to personal jurisdiction. The requirement that a court have personal jurisdiction flows not from Art. III, but from the Due Process Clause. The personal jurisdiction requirement recognizes and protects an individual liberty interest. It represents a restriction on judicial power not as a matter of sovereignty, but as a matter of individual liberty.[10] Thus, the test for personal jurisdiction

---

[9] A party that has had an opportunity to litigate the question of subject-matter jurisdiction may not, however, reopen that question in a collateral attack upon an adverse judgment. It has long been the rule that principles of res judicata apply to jurisdictional determinations—both subject matter and personal. See *Chicot County Drainage Dist.* v. *Baxter State Bank*, 308 U. S. 371 (1940); *Stoll* v. *Gottlieb*, 305 U. S. 165 (1938).

[10] It is true that we have stated that the requirement of personal jurisdiction, as applied to state courts, reflects an element of federalism and the

requires that "the maintenance of the suit . . . not offend 'traditional notions of fair play and substantial justice.'" *International Shoe Co.* v. *Washington,* 326 U. S. 310, 316 (1945), quoting *Milliken* v. *Meyer,* 311 U. S. 457, 463 (1940).

Because the requirement of personal jurisdiction represents first of all an individual right, it can, like other such rights, be waived. In *McDonald* v. *Mabee, supra,* the Court indicated that regardless of the power of the State to serve process, an individual may submit to the jurisdiction of the court by appearance. A variety of legal arrangements have been taken to represent express or implied consent to the personal jurisdiction of the court. In *National Equipment Rental, Ltd.* v. *Szukhent,* 375 U. S. 311, 316 (1964), we

---

character of state sovereignty vis-à-vis other States. For example, in *World-Wide Volkswagen Corp.* v. *Woodson,* 444 U. S. 286, 291–292 (1980), we stated:

"[A] state court may exercise personal jurisdiction over a nonresident defendant only so long as there exist 'minimum contacts' between the defendant and the forum State. The concept of minimum contacts, in turn, can be seen to perform two related, but distinguishable, functions. It protects the defendant against the burdens of litigating in a distant or inconvenient forum. And it acts to ensure that the States, through their courts, do not reach out beyond the limits imposed on them by their status as coequal sovereigns in a federal system." (Citation omitted.)

Contrary to the suggestion of JUSTICE POWELL, *post,* at 713–714, our holding today does not alter the requirement that there be "minimum contacts" between the nonresident defendant and the forum State. Rather, our holding deals with how the facts needed to show those "minimum contacts" can be established when a defendant fails to comply with court-ordered discovery. The restriction on state sovereign power described in *World-Wide Volkswagen Corp.,* however, must be seen as ultimately a function of the individual liberty interest preserved by the Due Process Clause. That Clause is the only source of the personal jurisdiction requirement and the Clause itself makes no mention of federalism concerns. Furthermore, if the federalism concept operated as an independent restriction on the sovereign power of the court, it would not be possible to waive the personal jurisdiction requirement: Individual actions cannot change the powers of sovereignty, although the individual can subject himself to powers from which he may otherwise be protected.

stated that "parties to a contract may agree in advance to submit to the jurisdiction of a given court," and in *Petrowski* v. *Hawkeye-Security Co.*, 350 U. S. 495 (1956), the Court upheld the personal jurisdiction of a District Court on the basis of a stipulation entered into by the defendant. In addition, lower federal courts have found such consent implicit in agreements to arbitrate. See *Victory Transport Inc.* v. *Comisaria General de Abastecimientos y Transportes*, 336 F. 2d 354 (CA2 1964); 2 J. Moore & J. Lucas, Moore's Federal Practice ¶ 4.02[3], n. 22 (1982) and cases listed there. Furthermore, the Court has upheld state procedures which find constructive consent to the personal jurisdiction of the state court in the voluntary use of certain state procedures. See *Adam* v. *Saenger*, 303 U. S. 59, 67–68 (1938) ("There is nothing in the Fourteenth Amendment to prevent a state from adopting a procedure by which a judgment *in personam* may be rendered in a cross-action against a plaintiff in its courts . . . . It is the price which the state may exact as the condition of opening its courts to the plaintiff"); *Chicago Life Ins. Co.* v. *Cherry*, 244 U. S. 25, 29–30 (1917) ("[W]hat acts of the defendant shall be deemed a submission to [a court's] power is a matter upon which States may differ"). Finally, unlike subject-matter jurisdiction, which even an appellate court may review *sua sponte*, under Rule 12(h), Federal Rules of Civil Procedure, "[a] defense of lack of jurisdiction over the person . . . is waived" if not timely raised in the answer or a responsive pleading.

In sum, the requirement of personal jurisdiction may be intentionally waived, or for various reasons a defendant may be estopped from raising the issue. These characteristics portray it for what it is—a legal right protecting the individual. The plaintiff's demonstration of certain historical facts may make clear to the court that it has personal jurisdiction over the defendant as a matter of law—*i. e.*, certain factual showings will have legal consequences—but this is not the only way in which the personal jurisdiction of the court may arise. The actions of the defendant may amount to a legal submis-

sion to the jurisdiction of the court, whether voluntary or not.

The expression of legal rights is often subject to certain procedural rules: The failure to follow those rules may well result in a curtailment of the rights. Thus, the failure to enter a timely objection to personal jurisdiction constitutes, under Rule 12(h)(1), a waiver of the objection. A sanction under Rule 37(b)(2)(A) consisting of a finding of personal jurisdiction has precisely the same effect. As a general proposition, the Rule 37 sanction applied to a finding of personal jurisdiction creates no more of a due process problem than the Rule 12 waiver. Although "a court cannot conclude all persons interested by its mere assertion of its own power," *Chicago Life Ins. Co.* v. *Cherry, supra,* at 29, not all rules that establish legal consequences to a party's own behavior are "mere assertions" of power.

Rule 37(b)(2)(A) itself embodies the standard established in *Hammond Packing Co.* v. *Arkansas,* 212 U. S. 322 (1909), for the due process limits on such rules.[11] There the Court held that it did not violate due process for a state court to strike the answer and render a default judgment against a defendant who failed to comply with a pretrial discovery order. Such a rule was permissible as an expression of "the undoubted right of the lawmaking power to create a presumption of fact as to the bad faith and untruth of an answer begotten from the suppression or failure to produce the proof ordered . . . . [T]he preservation of due process was secured by the presumption that the refusal to produce evidence material to the administration of due process was but an admission of the want of merit in the asserted defense." *Id.,* at 350–351.

---

[11] The Advisory Committee Notes to the Rule specifically stated that "the provisions of the rule find support in [*Hammond Packing Co.* v. *Arkansas,* 212 U. S. 322 (1909)]." Final Report of Advisory Committee on Rules for Civil Procedure 25 (1937). See also *Societe Internationale* v. *Rogers,* 357 U. S. 197, 209 (1958).

The situation in *Hammond* was specifically distinguished from that in *Hovey* v. *Elliott*, 167 U. S. 409 (1897), in which the Court held that it did violate due process for a court to take similar action as "punishment" for failure to obey an order to pay into the registry of the court a certain sum of money. Due process is violated only if the behavior of the defendant will not support the *Hammond Packing* presumption. A proper application of Rule 37(b)(2) will, as a matter of law, support such a presumption. See *Societe Internationale* v. *Rogers*, 357 U. S. 197, 209–213 (1958). If there is no abuse of discretion in the application of the Rule 37 sanction, as we find to be the case here (see Part III), then the sanction is nothing more than the invocation of a legal presumption, or what is the same thing, the finding of a constructive waiver.

Petitioners argue that a sanction consisting of a finding of personal jurisdiction differs from all other instances in which a sanction is imposed, including the default judgment in *Hammond Packing*, because a party need not obey the orders of a court until it is established that the court has personal jurisdiction over that party. If there is no obligation to obey a judicial order, a sanction cannot be applied for the failure to comply. Until the court has established personal jurisdiction, moreover, any assertion of judicial power over the party violates due process.

This argument again assumes that there is something unique about the requirement of personal jurisdiction, which prevents it from being established or waived like other rights. A defendant is always free to ignore the judicial proceedings, risk a default judgment, and then challenge that judgment on jurisdictional grounds in a collateral proceeding. See *Baldwin* v. *Traveling Men's Assn.*, 283 U. S. 522, 525 (1931). By submitting to the jurisdiction of the court for the limited purpose of challenging jurisdiction, the defendant agrees to abide by that court's determination on the issue of jurisdiction: That decision will be res judicata on that issue in any further proceedings. *Id.*, at 524; *American Surety Co.*

v. *Baldwin*, 287 U. S. 156, 166 (1932). As demonstrated above, the manner in which the court determines whether it has personal jurisdiction may include a variety of legal rules and presumptions, as well as straightforward factfinding. A particular rule may offend the due process standard of *Hammond Packing*, but the mere use of procedural rules does not in itself violate the defendant's due process rights.

## III

Even if Rule 37(b)(2) may be applied to support a finding of personal jurisdiction, the question remains as to whether it was properly applied under the circumstances of this case. Because the District Court's decision to invoke the sanction was accompanied by a detailed explanation of the reasons for that order and because that decision was upheld as a proper exercise of the District Court's discretion by the Court of Appeals, this issue need not detain us for long. What was said in *National Hockey League* v. *Metropolitan Hockey Club, Inc.*, 427 U. S. 639, 642 (1976), is fully applicable here: "The question, of course, is not whether this Court, or whether the Court of Appeals, would as an original matter have [applied the sanction]; it is whether the District Court abused its discretion in so doing" (citations omitted). For the reasons that follow, we hold that it did not.

Rule 37(b)(2) contains two standards—one general and one specific—that limit a district court's discretion. First, any sanction must be "just"; second, the sanction must be specifically related to the particular "claim" which was at issue in the order to provide discovery. While the latter requirement reflects the rule of *Hammond Packing, supra,* the former represents the general due process restrictions on the court's discretion.

In holding that the sanction in this case was "just," we rely specifically on the following. First, the initial discovery request was made in July 1977. Despite repeated orders from the court to provide the requested material, on December 21, 1978, the District Court was able to state that the petitioners

"haven't even made any effort to get this information up to this point." 1 App. 112a. The court then warned petitioners of a possible sanction. Confronted with continued delay and an obvious disregard of its orders, the trial court's invoking of its powers under Rule 37 was clearly appropriate. Second, petitioners repeatedly agreed to comply with the discovery orders within specified time periods. In each instance, petitioners failed to comply with their agreements. Third, respondent's allegation that the court had personal jurisdiction over petitioners was not a frivolous claim, and its attempt to use discovery to substantiate this claim was not, therefore, itself a misuse of judicial process. The substantiality of the jurisdictional allegation is demonstrated by the fact that the District Court found, as an alternative ground for its jurisdiction, that petitioners had sufficient contacts with Pennsylvania to fall within the State's long-arm statute. *Supra*, at 699. Fourth, petitioners had ample warning that a continued failure to comply with the discovery orders would lead to the imposition of this sanction. Furthermore, the proposed sanction made it clear that, even if there was not compliance with the discovery order, this sanction would not be applied if petitioners were to "produce statistics and other information" that would indicate an absence of personal jurisdiction. 1 App. 116a. In effect, the District Court simply placed the burden of proof upon petitioners on the issue of personal jurisdiction.[12] Petitioners failed to comply with the discovery order; they also failed to make any attempt to meet this burden of proof. This course of behavior, coupled with the ample warnings, demonstrates the "justice" of the trial court's order.

Neither can there be any doubt that this sanction satisfies the second requirement. CBG was seeking through discov-

---

[12] Counsel for petitioners agreed to this characterization of the sanction at oral argument. Tr. of Oral Arg. 47–48.

ery to respond to petitioners' contention that the District Court did not have personal jurisdiction. Having put the issue in question, petitioners did not have the option of blocking the reasonable attempt of CBG to meet its burden of proof. It surely did not have this option once the court had overruled petitioners' objections. Because of petitioners' failure to comply with the discovery orders, CBG was unable to establish the full extent of the contacts between petitioners and Pennsylvania, the critical issue in proving personal jurisdiction. Petitioners' failure to supply the requested information as to its contacts with Pennsylvania supports "the presumption that the refusal to produce evidence . . . was but an admission of the want of merit in the asserted defense." *Hammond Packing*, 212 U. S., at 351. The sanction took as established the facts—contacts with Pennsylvania—that CBG was seeking to establish through discovery. That a particular legal consequence—personal jurisdiction of the court over the defendants—follows from this, does not in any way affect the appropriateness of the sanction.

## IV

Because the application of a legal presumption to the issue of personal jurisdiction does not in itself violate the Due Process Clause and because there was no abuse of the discretion granted a district court under Rule 37(b)(2), we affirm the judgment of the Court of Appeals.

*So ordered.*

JUSTICE POWELL, concurring in the judgment.

The Court rests today's decision on a constitutional distinction between "subject matter" and *"in personam"* jurisdiction. Under this distinction, subject-matter jurisdiction defines an Art. III limitation on the power of federal courts. By contrast, the Court characterizes the limits on *in personam* jurisdiction solely in terms of waivable personal rights and notions of "fair play." Having done so, it determines

that fundamental questions of judicial power do not arise in this case concerning the personal jurisdiction of a federal district court.

In my view the Court's broadly theoretical decision misapprehends the issues actually presented for decision. Federal courts are courts of limited jurisdiction. Their personal jurisdiction, no less than their subject-matter jurisdiction, is subject both to constitutional and to statutory definition. When the applicable limitations on federal jurisdiction are identified, it becomes apparent that the Court's theory could require a sweeping but largely unexplicated revision of jurisdictional doctrine. This revision could encompass not only the personal jurisdiction of federal courts but "sovereign" limitations on state jurisdiction as identified in *World-Wide Volkswagen Corp.* v. *Woodson,* 444 U. S. 286, 291–293 (1980). Fair resolution of this case does not require the Court's broad holding. Accordingly, although I concur in the Court's judgment, I cannot join its opinion.

## I

This lawsuit began when the respondent Compagnie des Bauxites brought a contract action against the petitioner insurance companies in the United States District Court for the Western District of Pennsylvania. Alleging diversity jurisdiction, respondent averred that the District Court had personal jurisdiction of the petitioners, all foreign corporations, under the long-arm statute of the State of Pennsylvania. See *Compagnie des Bauxites de Guinea* v. *Insurance Co. of North America,* 651 F. 2d 877, 880–881 (CA3 1981). Petitioners, however, denied that they were subject to the court's personal jurisdiction under that or any other statute. Viewing the question largely as one of fact, the court ordered discovery to resolve the dispute.

Meantime, while respondent unsuccessfully sought compliance with its discovery requests, petitioners brought a parallel action in England's High Court of Justice, Queens Bench

Division. It was at this juncture that the current issues arose. Seeking to enjoin the English proceedings, respondent sought an injunction in the District Court. Petitioners protested that they were not subject to that court's personal jurisdiction and thus that they lay beyond its injunctive powers. But the District Court disagreed. As a jurisdictional prerequisite to its entry of the injunction, the court upheld its personal jurisdiction over petitioners.[1] It characterized its finding of jurisdiction partly as a sanction for petitioners' noncompliance with its discovery orders under Federal Rule of Civil Procedure 37(b).[2]

Rule 37(b) is not, however, a jurisdictional provision. As recognized by the Court of Appeals, the governing jurisdictional statute remains the long-arm statute of the State of Pennsylvania. See 651 F. 2d, at 881. In my view the Court fails to make clear the implications of this central fact: that the District Court in this case relied on state law to obtain personal jurisdiction.

As courts of limited jurisdiction, the federal district courts possess no warrant to create jurisdictional law of their own. Under the Rules of Decision Act, 28 U. S. C. § 1652, they must apply state law "except where the Constitution or treaties of the United States or Acts of Congress otherwise require or provide . . . ." See generally *Erie R. Co.* v. *Tompkins*, 304 U. S. 64 (1938). Thus, in the absence of a federal rule or statute establishing a federal basis for the assertion of personal jurisdiction, the personal jurisdiction of the district courts is determined in diversity cases by the law of the forum State. See, *e. g., Intermeat, Inc.* v. *American Poultry Co.*, 575 F. 2d 1017 (CA2 1978); *Wilkerson* v. *Fortuna Corp.*,

---

[1] A district court must have personal jurisdiction over a party before it can enjoin its actions. *Zenith Radio Corp.* v. *Hazeltine Research, Inc.*, 395 U. S. 100, 111–112 (1969).

[2] The court also found that petitioners in fact had undertaken sufficient business activity in the State to bring them within the reach of the Pennsylvania long-arm statute. See App. to Pet. for Cert. 51a, 53a.

554 F. 2d 745 (CA5), cert. denied, 434 U. S. 939 (1977); *Poyner* v. *Erma Werke Gmbh,* 618 F. 2d 1186, 1187 (CA6 1980); *Lakeside Bridge & Steel Co.* v. *Mountain State Constr. Co.,* 597 F. 2d 596 (CA7 1979), cert. denied, 445 U. S. 907 (1980); *Lakota Girl Scout Council, Inc.* v. *Havey Fundraising Management, Inc.,* 519 F. 2d 634 (CA8 1975); *Arrowsmith* v. *United Press International,* 320 F. 2d 219, 226 (CA2 1963); *Forsythe* v. *Overmyer,* 576 F. 2d 779, 782 (CA9), cert. denied, 439 U. S. 864 (1978); *Quarles* v. *Fuqua Industries, Inc.,* 504 F. 2d 1358 (CA10 1974).[3]

As a result of the District Court's dependence on the law of Pennsylvania to establish personal jurisdiction—a dependence mandated by Congress under 28 U. S. C. § 1652—its jurisdiction in this case normally would be subject to the same due process limitations as a state court. See, *e. g., Forsythe* v. *Overmyer, supra,* at 782; *Washington* v. *Norton Mfg., Inc.,* 588 F. 2d 441, 445 (CA5 1979); *Fisons Ltd.* v. *United States,* 458 F. 2d 1241, 1250 (CA7 1972).[4] Thus, the question arises how today's decision is related to cases restricting the personal jurisdiction of the States.

Before today our decisions had established that "minimum contacts" represented a constitutional prerequisite to the exercise of *in personam* jurisdiction over an unconsenting defendant. See, *e. g., World-Wide Volkswagen Corp.* v. *Wood-*

---

[3] As Judge Friendly explained in the leading case of *Arrowsmith* v. *United Press International,* 320 F. 2d, at 226:

"State statutes determining what foreign corporations may be sued, for what, and by whom, are not mere whimsy; like most legislation they represent a balancing of various considerations—for example, affording a forum for wrongs connected with the state and conveniencing resident plaintiffs, while avoiding the discouragement of activity within the state by foreign corporations. We see nothing in the concept of diversity jurisdiction that should lead us to read into the governing statutes a Congressional mandate, unexpressed by Congress itself, to disregard the balance thus struck by the states."

[4] It is not contended that there is any federal basis for the exercise of personal jurisdiction by the District Court.

*son,* 444 U. S., at 291–293; *Hanson* v. *Denckla,* 357 U. S. 235, 251 (1958); *International Shoe Co.* v. *Washington,* 326 U. S. 310, 316 (1945). In the absence of a showing of minimum contacts, a finding of personal jurisdiction over an unconsenting defendant, even as a sanction, therefore would appear to transgress previously established constitutional limitations. The cases cannot be reconciled by a simple distinction between the constitutional limits on state and federal courts. Because of the District Court's reliance on the Pennsylvania long-arm statute—the applicable jurisdictional provision under the Rules of Decisions Act—the relevant constitutional limits would not be those imposed directly on federal courts by the Due Process Clause of the Fifth Amendment, but those applicable to state jurisdictional law under the Fourteenth.

The Court's decision apparently must be understood as related to our state jurisdictional cases in one of two ways. Both involve legal theories that fail to justify the doctrine adopted by the Court in this case.

A

Under traditional principles, the due process question in this case is whether "minimum contacts" exist between petitioners and the forum State that would justify the State in exercising personal jurisdiction. See, *e. g., World-Wide Volkswagen Corp.* v. *Woodson, supra,* at 291–293; *Shaffer* v. *Heitner,* 433 U. S. 186, 216 (1977); *Hanson* v. *Denckla, supra,* at 251. By finding that the establishment of minimum contacts is not a prerequisite to the exercise of jurisdiction to impose sanctions under Federal Rule of Civil Procedure 37, the Court may be understood as finding that "minimum contacts" no longer are a constitutional requirement for the exercise by a state court of personal jurisdiction over an unconsenting defendant.[5] Whenever the Court's no-

---

[5] The Court refers to the respondent's prima facie showing of "minimum contacts" only as one factor indicating that the District Court did not abuse

tions of fairness are not offended, jurisdiction apparently may be upheld.

Before today, of course, our cases had linked minimum contacts and fair play as *jointly* defining the "sovereign" limits on state assertions of personal jurisdiction over unconsenting defendants. See *World-Wide Volkswagen Corp.* v. *Woodson, supra,* at 292–293; see *Hanson* v. *Denckla, supra,* at 251. The Court appears to abandon the rationale of these cases in a footnote. See *ante,* at 702–703, n. 10. But it does not address the implications of its action. By eschewing reliance on the concept of minimum contacts as a "sovereign" limitation on the power of States—for, again, it is the State's long-arm statute that is invoked to obtain personal jurisdiction in the District Court—the Court today effects a potentially substantial change of law. For the first time it defines personal jurisdiction solely by reference to abstract notions of fair play. And, astonishingly to me, it does so in a case in which this rationale for decision was neither argued nor briefed by the parties.

### B

Alternatively, it is possible to read the Court opinion, not as affecting state jurisdiction, but simply as asserting that Rule 37 of the Federal Rules of Civil Procedure represents a congressionally approved basis for the exercise of personal jurisdiction by a federal district court. On this view Rule 37 vests the federal district courts with authority to take jurisdiction over persons not in compliance with discovery orders. This of course would be a more limited holding. Yet the Court does not cast its decision in these terms. And it provides no support for such an interpretation, either in the language or in the history of the Federal Rules.

---

its discretion in entering a finding of personal jurisdiction as a sanction under Rule 37(b). See *ante,* at 708. Generally it views the requirement of personal jurisdiction as a right that may be "established or waived like other rights." *Ante,* at 706.

In the absence of such support, I could not join the Court in embracing such a construction of the Rules of Civil Procedure.[6] There is nothing in Rule 37 to suggest that it is intended to confer a grant of personal jurisdiction. Indeed, the clear language of Rule 82 seems to establish that Rule 37 should *not* be construed as a jurisdictional grant: "These rules shall not be construed to extend . . . the jurisdiction of the United States district courts or the venue of actions therein." Moreover, assuming that minimum contacts remain a constitutional predicate for the exercise of a State's *in personam* jurisdiction over an unconsenting defendant, constitutional questions would arise if Rule 37 were read to permit a plaintiff in a diversity action to subject a defendant to a "fishing expedition" in a foreign jurisdiction. A plaintiff is not entitled to discovery to establish essentially speculative allegations necessary to personal jurisdiction. Nor would the use of Rule 37 sanctions to enforce discovery orders constitute a mere abuse of discretion in such a case.[7] For me at least, such a use of discovery would raise serious questions as to the constitutional as well as the statutory authority of a federal court—in a diversity case—to exercise personal juris-

---

[6] Jurisdiction over the person generally is dealt with by Rule 4, governing the methods of service through which personal jurisdiction may be obtained. Although Rule 4 deals expressly only with service of process, not with the underlying jurisdictional prerequisites, jurisdiction may not be obtained unless process is served in compliance with applicable law. See, *e. g., Intermeat, Inc.* v. *American Poultry Co.*, 575 F. 2d 1017 (CA2 1978); *Washington* v. *Norton Mfg., Inc.*, 588 F. 2d 441, 445 (CA5 1979); D. Currie, Federal Courts 858 (2d ed. 1975). For this reason Rule 4 frequently has been characterized as a jurisdictional provision. See, *e. g.*, 374 U. S. 869 (1963) (statement of Black and Douglas, JJ., dissenting from adoption of amendments to the Federal Rules of Civil Procedure); Currie, *supra*, at 858; Foster, Long-Arm Jurisdiction in Federal Courts, 1969 Wis. L. Rev. 9, 11. As applicable here, Rule 4 relies expressly on state law. See Fed. Rules Civ. Proc. 4(d)(7) and (e).

[7] Compare the Court's view. *Ante*, at 707.

diction absent some showing of minimum contacts between the unconsenting defendant and the forum State.

## II

In this case the facts alone—unaided by broad jurisdictional theories—more than amply demonstrate that the District Court possessed personal jurisdiction to impose sanctions under Rule 37 and otherwise to adjudicate this case. I would decide the case on this narrow basis.

As recognized both by the District Court and the Court of Appeals, the respondent adduced substantial support for its jurisdictional assertions. By affidavit and other evidence, it made a prima facie showing of "minimum contacts." See 651 F. 2d, at 881–882, 886, and n. 9. In the view of the District Court, the evidence adduced actually was sufficient to sustain a finding of personal jurisdiction independently of the Rule 37 sanction. App. to Pet. for Cert. 51a, 53a.[8]

Where the plaintiff has made a prima facie showing of minimum contacts, I have little difficulty in holding that its showing was sufficient to warrant the District Court's entry of discovery orders. And where a defendant then fails to comply with those orders, I agree that the prima facie showing may be held adequate to sustain the court's finding that minimum contacts exist, either under Rule 37 or under a theory of "presumption" or "waiver."

Finding that the decision of the Court of Appeals should be affirmed on this ground, I concur in the judgment of the Court.

---

[8] The Court of Appeals deemed it unnecessary to review this alternative basis for the District Court's finding of jurisdiction. See 651 F. 2d, at 886, and n. 9.