430 F.3d 221
 Mattie LOLAVAR, t/a Triumph Communications International Group, Incorporated; Triumph Communications International Group, Incorporated, Plaintiffs-Appellants,
v.
Fernando DE SANTIBAÑES, Defendant-Appellee, and
IKON Holdings, Incorporated, t/a Ikon Public Affairs, t/a Ikon Public Affairs, LLC, t/a Ikon Public Affairs, Incorporated; Dick Morris; Roger Stone; Eileen McGann; John Does, # 1-10, Defendants.
 No. 04-1901.
 United States Court of Appeals, Fourth Circuit.
 Argued September 20, 2005.
 Decided December 1, 2005.
 
 ARGUED: Bruce Elliott Fein, Washington, D.C., for Appellants. William M. Brodsky, Fox, Horan & Camerini, New York, New York, for Appellee. ON BRIEF: Gary Sheehan, Fairfax, Virginia, for Appellants. Jonathan Mazer, Fox, Horan & Camerini, New York, New York, for Appellee.
 Before WIDENER and TRAXLER, Circuit Judges, and HARWELL, United States District Judge for the District of South Carolina, sitting by designation.
 Affirmed by published opinion. Judge WIDENER wrote the opinion, in which Judge TRAXLER and Judge HARWELL concurred.
 OPINION
 WIDENER, Circuit Judge.
 
 
 1
 This case arises from a state suit alleging several common law causes of action, including breach of contract, defamation and conspiracy. One of the defendants, Fernando de Santibañes, removed the action to the district court and moved to dismiss himself from the case for lack of personal jurisdiction. Plaintiffs challenged the removal as untimely under 28 U.S.C. § 1446(b) and as not against a foreign state under 28 U.S.C. § 1441(d). The district court granted de Santibañes' motion to dismiss himself, holding there was no in personam jurisdiction, without first considering its subject-matter jurisdiction under the removal statutes. It then remanded the case to the state court. We affirm.
 
 I.
 A.
 
 2
 Triumph Communications International Group, Incorporated is a corporation that provides political consulting and public relations services and is owned and operated solely by Mattie Lolavar.[1]
 
 
 3
 In early 2000, Miss Lolavar began discussions with defendant Dick Morris about the possibility of her working with Craig Snyder and defendant Roger Stone, who are partners in defendant IKON Holdings, Inc., another political consulting firm. Miss Lolavar had additional discussions with defendant Eileen McGann, Morris' wife, about the possibility of Triumph Communications' assistance with work that IKON was doing for the government of Argentina.
 
 
 4
 These discussions lead to two contracts concerning Triumph and IKON. The first, between IKON and de Santibañes, which was signed on May 31, 2000, had a one-month term and was connected with Argentine President Fernando de la Rua's June 2000 visit to the United States. Triumph was there listed as sub-agent of IKON. The second, between IKON and Triumph, signed on July 21, 2000, was to last for a year, and provided that Triumph would act as a public relations consultant to "the Secretary of Intelligence of Argentina" as well as arrange various media events that promoted Argentina in the American media. Fernando de Santibañes was Secretary of Intelligence of Argentina at the time the contract was signed.
 
 
 5
 Pursuant to this second contract, Miss Lolavar went to Argentina in August 2000 to assist de Santibañes with preparations for his testimony in Argentine congressional hearings inquiring into allegations that he and the Argentine intelligence agency, known as SIDE, were responsible for bribing various Argentine senators in exchange for political support.
 
 
 6
 Morris and Stone assigned other tasks to Miss Lolavar while she was in Argentina. Among other acts, they instructed her to contact SIDE and obtain a list of journalists who accepted bribes from that organization in order to harm the credibility of those same journalists in reporting on a bribery scandal surrounding de Santibañes and President de la Rua, as well as requiring her to spread false information to the press concerning de la Rua's political opponent, Dr. Carlos Menem.
 
 
 7
 A request that occasioned controversy between Miss Lolavar and the defendants was Morris and Stone's request that she serve as an intermediary in an anonymous wire transfer of funds to an official in Israel. These funds were to be paid to secure intelligence files from the Israeli government to assist de la Rua's political domestic disputes with Menem, and to imply a corrupt relationship between Menem and George W. Bush, who was then running against Albert Gore for the United States presidency. These files were to be altered by Miss Lolavar to appear to be SIDE documents.
 
 
 8
 When the defendants became concerned that this plot would be discovered and traced back to them, they ordered Miss Lolavar to orchestrate a press response to blame Vice President Gore for the dissemination of the documents, since it was known to them that the Gore campaign had been attempting to connect Menem with the Bush campaign.
 
 
 9
 When Miss Lolavar refused to cooperate with these demands, the defendants undertook a series of reprisals. First, they refused to pay her fees under the contract until she executed the wire transfers. Additionally, they made a number of false defamatory statements concerning her, including that she was anti-Semitic, that her efforts to disclose these transactions were the result of a political bribe by Menem's Peronist Party, and that she forged the correspondence that was evidence of the defendants' wrongdoing.
 
 B.
 
 10
 In response to the defendants' actions, Miss Lolavar filed the complaint in this case in the Circuit Court of Fairfax County, Virginia. De Santibañes made a special appearance in the Fairfax Circuit Court to prosecute a motion to quash service of process. This motion was denied on February 14, 2004. De Santibañes subsequently removed the case to the U.S. District Court for the Eastern District of Virginia on March 5, 2004. In the district court, de Santibañes once again made a special appearance to challenge the court's jurisdiction over him, arguing that he lacked sufficient minimum contacts to constitutionally subject him to suit in Virginia.
 
 
 11
 The plaintiffs filed a motion to depose de Santibañes. Neither side appeared before the magistrate judge when the motion was scheduled to be heard. The plaintiffs claim without documentation that this was the result of erroneous directions by the clerk's office that the hearing would take place before the district court, rather than a magistrate. The defendants have not addressed that fact, and the record throws no definitive light on the question. The district court subsequently dismissed the suit against de Santibañes for lack of personal jurisdiction and denied the plaintiffs' Rule 59(e) motion to alter or amend the judgment. In the same order, the district court granted a motion by plaintiffs to remand this case to the Circuit Court of Fairfax County. The plaintiffs appealed.
 
 II.
 
 12
 We review de novo a district court's dismissal for lack of personal jurisdiction. Christian Science Bd. of Dirs. of the First Church of Christ, Scientist v. Nolan, 259 F.3d 209, 215 (4th Cir.2001). However, we review underlying factual findings for clear error, ALS Scan, Inc. v. Digital Serv. Consultants, Inc., 293 F.3d 707, 710 (4th Cir.2002), and the decision to address personal jurisdiction prior to subject-matter jurisdiction for abuse of discretion. Ruhrgas AG v. Marathon Oil Co., 526 U.S. 574, 588, 119 S.Ct. 1563, 143 L.Ed.2d 760 (1999) (holding that the district court did not abuse its discretion in first deciding personal jurisdiction).
 
 
 13
 As a preliminary matter, de Santibañes now argues that the plaintiffs' notice of appeal stated only that it was appealing the district court's ruling on their Rule 59(e) motion to alter or amend the judgment dismissing for lack of personal jurisdiction. That argument is questionable, but even if not, because the case has been briefed and argued upon the merits of the underlying orders of the district court, we do not ground this decision upon any such argument and will consider the appeal as being from the underlying judgment as well as the motion to alter or amend the judgment. See Foman v. Davis, 371 U.S. 178, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962); Town of Norwood v. New England Power Co., 202 F.3d 408, 415 (1st Cir.2000); 11 Wright, Miller & Kane, Federal Practice and Procedure § 2818, at 192-93 & n. 11 (2d ed.1995).
 
 III.
 
 14
 The plaintiffs' brief presents a single issue on appeal, which is: "[w]hether the district court committed legal error in deciding the merits of Appellee's personal jurisdiction defense without deciding whether subject matter jurisdiction attached. . . where the subject matter jurisdiction question was neither difficult nor novel." Br. p. 1.
 
 
 15
 An initial difficulty with the issue, as just stated in plaintiffs' brief, is that the record in this court does not demonstrate that the question of subject matter jurisdiction is "neither difficult nor novel."
 
 
 16
 The first uncertainty is the plaintiffs' contention that de Santibañes' removal was untimely. The statute governing removal allows defendants to remove "within thirty days after the receipt by the defendant, through service or otherwise, of a copy of the initial pleading setting forth the claim for relief upon which such action or proceeding is based." 28 U.S.C. § 1446(b). However, according to the state court docket sheet,[2] the record does not contain the initial motion for judgment[3] that was filed in the state court on September 12, 2002. Neither does it contain the first and second amended motions for judgment filed February 14 and March 7, 2003. There is no indication when or even if de Santibañes received copies of these versions of the complaint, by way of service or otherwise. Process was issued September 16, 2002. Whether or when that process was executed, the record does not show.
 
 
 17
 Instead, the earliest motion for judgment in the record is the third amended motion for judgment, which was not filed in the state court until May 30, 2003. The record does not indicate exactly when de Santibañes received, or became aware of, this version of the complaint. It may well have been when the state court's order of February 13, 2004 held service of process effective. The February 13, 2004 order gave plaintiffs 21 days to serve a fourth amended motion for judgment, a copy of which is in the appendix but which apparently was never filed. In de Santibañes' opposition to the plaintiffs' remand motion, he asserts that the complaint was not served on him, rather it was mailed to someone at the "Midwest Training Center" in Elk River, Minnesota. The record does not indicate what, if any, ties de Santibañes has to the Midwest Training Center, or whether any acceptance of the document there served fulfills the removal statute's requirement that the defendant receive the document.
 
 
 18
 The third amended motion for judgment raised a new difficulty as well. At least in that motion for judgment, the plaintiffs alleged that "during all times relevant herein . . . [de Santibañes was] employed as the Secretary of Intelligence for the Government of Argentina, also known as SIDE," (JA 17); "de Santibañes was the foreign principal under the contracts who then served as the Secretary of Intelligence in Argentina for the agency known as SIDE," (JA 19); "de Santibañes and his agency conducted business with the plaintiff," (JA 19); and "de Santibañes traveled as Secretary of Intelligence for purposes related to the causes of action herein." (JA 19). These statements provide support for de Santibañes' allegations that his acts in the suit were done in his capacity as an official of a foreign sovereign, which could entitle him to immunity from "jurisdiction of the courts of the United States and of the States" under 28 U.S.C. § 1603. See 28 U.S.C. §§ 1603-1607.
 
 
 19
 However, determining whether de Santibañes was actually acting as an agent of a sovereign state is not as uncomplicated as plaintiffs would have it. Despite these statements in the third amended motion for judgment, the plaintiffs have since insisted that their suit is proceeding against him in his individual, rather than his official, capacity. For example, in their motion for remand, filed March 24, 2004, they assert that de Santibañes was being sued "in his individual capacity as a citizen of Argentina . . . not an instrumentality of a foreign state" for actions "outside the scope of his official responsibilities as chief of the Argentine intelligence agency, SIDE." (JA 164)
 
 
 20
 The shifting positions of the plaintiffs are compounded by the existence of what we are told is a "Fourth Amended Motion for Judgment," which has deleted some of the just referenced statements concerning de Santibañes, and instead includes more vague allegations with respect to de Santibañes' resignation from his Argentina government post and his status, apparently when the complaint was filed, rather than his status at the time the alleged events took place. (JA 85) This fourth amended motion for judgment does not appear on the state court's docket sheet, although de Santibañes states in his motion to dismiss for lack of personal jurisdiction that "[h]e was then formally served with the Forth (sic) Amended Motion For Judgment several days [after losing his motion to quash summons in the state court]." (JA 169) As such, it is unclear at best which allegations the court should look to in determining the then present status of the case and its status in the relevant past.
 
 
 21
 Ultimately, the district court would have been required to conduct an extensive hearing that also might have addressed many of the same facts relating to jurisdiction as would be litigated in the actual trial, in order to determine what de Santibañes' status actually was during his alleged activities.
 
 
 22
 Compounding the difficulties attendant to de Santibañes' potential status as an official of a foreign government is the effect that it has on the already confused removal procedure. 28 U.S.C. § 1441(d), which governs the removal of civil actions against foreign nations, allows the thirty day time limits found in 1446(b) to be enlarged "at any time for cause shown." This provision would add another layer of complexity to the already difficult question of whether the removal was timely, and require the district court to ascertain by hearing, if required, to determine if the facts of this case demonstrate sufficient cause to excuse any delay.
 
 
 23
 The district court was presented this incomplete and perhaps contradictory record. The plaintiffs immediately filed a motion for remand and challenged the existence of subject matter jurisdiction on a number of grounds that included the timing of the removal and de Santibañes' status as an official of the Argentine government. Ruling on that motion would have required the district court to examine and make findings on at least the difficulties discussed above. Our catalog of these problems demonstrates that, contrary to the plaintiffs' argument, the question of subject matter jurisdiction in this case was not "neither difficult nor novel."
 
 
 24
 However, the district court was not required to preside over a debate on subject matter jurisdiction. At the same time the plaintiffs' motion for remand was under consideration, de Santibañes filed his motion to dismiss for lack of personal jurisdiction. This motion was supported by an uncontested affidavit detailing that de Santibañes had essentially no contacts with Virginia or with the plaintiffs, including that he had never resided in Virginia, did not own any property in the State, does not receive income from any business with operations in the State, and has never sent nor received correspondence from the State.[4] The plaintiffs did not contest the information in the affidavit by way of affidavit or testimony. Although they did request a deposition of de Santibañes, they failed to appear at the hearing before the magistrate judge, leading the magistrate judge to enter an order denying the deposition request. The district court affirmed that decision.
 
 
 25
 The Supreme Court's decision in Ruhrgas was crafted to allow courts that find themselves in situations such as that currently before us to avoid the large and difficult issues when a more straightforward solution is present. There, the Court reasoned that "[w]here . . . a district court has before it a straightforward personal jurisdiction issue presenting no complex question of state law, and the alleged defect in subject-matter jurisdiction raises a difficult and novel question, the court does not abuse its discretion by turning directly to personal jurisdiction." Ruhrgas AG, 526 U.S. at 588, 119 S.Ct. 1563. In such circumstances, "a federal court may decide a straightforward question concerning personal jurisdiction without first determining that it has subject-matter jurisdiction over the case." Constantine v. Rectors and Visitors of George Mason Univ., 411 F.3d 474, 480 (4th Cir.2005), citing Ruhrgas AG, 526 U.S. at 588, 119 S.Ct. 1563. This is because "there is no unyielding jurisdictional hierarchy," Ruhrgas AG, 526 U.S. at 578, 119 S.Ct. 1563, and because "[t]he validity of an order of a federal court depends upon that court's having jurisdiction over both the subject matter and the parties." Constantine, 411 F.3d at 480 (quoting Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee, 456 U.S. 694, 702, 102 S.Ct. 2099, 72 L.Ed.2d 492 (1982)) (emphasis in original).
 
 
 26
 Here, the facts and circumstances of the litigation demonstrate that the issues of subject matter jurisdiction raised in this case would be substantial and perhaps difficult to resolve. In such a situation, the district court properly elected to address the straightforward and simple personal jurisdiction question without first addressing subject-matter jurisdiction.
 
 
 27
 In arriving at our conclusion, we emphasize that by addressing the assignment of error which we have quoted above from the plaintiffs' brief, we do not indicate that that assignment of error states the correct standard. The standard of review of the orders of the district court, which had chosen between questions of personal and subject matter jurisdiction, is abuse of discretion. Ruhrgas AG, 526 U.S. at 588, 119 S.Ct. 1563. In considering which jurisdictional question to address, the district court is entitled to consider whether each of the jurisdictional issues, personal or subject matter, are simple and straightforward or are complex and perhaps difficult. Upon making its choice of which avenue to follow, the district court should be affirmed unless it has abused its discretion. And it is not an abuse of such discretion to choose the simple and straightforward, as here, as opposed to a complex and perhaps difficult route.
 
 
 28
 We hold that the district court did not abuse its discretion in deciding first the question of personal jurisdiction.
 
 IV.
 
 29
 Certain other matters should be mentioned.
 
 A.
 
 30
 Bell v. Hood, 327 U.S. 678, 66 S.Ct. 773, 90 L.Ed. 939 (1946) is the principal reliance of plaintiffs for the proposition that a district court must consider subject matter jurisdiction before considering personal jurisdiction. While in somewhat different context, Bell v. Hood, so far as it applies to this case, would lead to the opposite conclusion. In that case, the plaintiffs sued FBI agents, claiming an unlawful search and unlawful imprisonment were violations of the Fourth and Fifth Amendments to the Constitution, and actionable as a case of federal question jurisdiction under the then arising under statute, 28 U.S.C. § 41(1). The district court dismissed the case for want of federal question jurisdiction and was affirmed by the court of appeals. The Supreme Court, however, reversed. It held that since there was a question as to whether or not the allegations of the complaint stated a cause of action on which the Court could grant relief, and since the claim of such a cause of action for unlawful search and imprisonment was not wholly insubstantial or frivolous, or immaterial and made for the sole purpose of obtaining jurisdiction, the district court should have "assume[d] jurisdiction to decide whether the allegations state[d] a cause of action on which the Court [could] grant relief . . ." 327 U.S. at 682, 66 S.Ct. 773.
 
 
 31
 Bell v. Hood has been followed in many cases in the courts of appeals, including our own. For example, in Donohoe Const. Co., Inc. v. Montgomery Cty. Council, 567 F.2d 603 (4th Cir.1977), a case similar to Bell v. Hood in which the claim was a de facto taking of property, we held that the district court "acted properly in assuming jurisdiction under 28 U.S.C. § 1331" to decide the merits of the controversy so long as the questions raised were not frivolous on their face. Donohoe, 567 F.2d at 607. And in Sunrise Corp., Myrtle Beach v. Myrtle Beach, 420 F.3d 322 (4th Cir.2005), a district court was reversed for dismissing for lack of prudential standing when the contested basis for jurisdiction was also an element of plaintiffs' federal claim. We held it should have addressed the objection to jurisdiction as an attack on the merits. Sunrise Corp., 420 F.3d at 325, n. 1.
 
 
 32
 Thus, Bell v. Hood and its applications in this circuit demonstrate that there is no invariable rule, as plaintiffs claim, that in each instance a district court must find its subject matter jurisdiction before addressing other questions in the controversy. We hold that plaintiffs' reliance on Bell v. Hood and the cases following that decision is misplaced.
 
 B.
 
 33
 On appeal, the plaintiffs do not directly attack the holding of the district court, based on de Santibañes' uncontradicted affidavit, that it lacked personal jurisdiction. Their argument goes, however, that personal jurisdiction is obtained upon ". . . a theory of co-conspirator personal jurisdiction, where the actions of one co-conspirator in the forum [S]tate can be attributed to the other co-conspirators for purpose of personal jurisdiction." Br. at 9, n. 1.
 
 
 34
 The district court held a hearing on de Santibañes' motion to dismiss himself from the case for want of personal jurisdiction over him. Essentially, the district court's decision is expressed in this quotation from its opinion:
 
 
 35
 Nothing which is before the Court provides any basis for a finding of personal jurisdiction under a conspiracy theory over de Santibañes, beyond the mere allegation of a conspiracy. J.A. 193.
 
 
 36
 The case was removed to the federal district court from the Circuit Court of Fairfax County on March 5, 2004. On March 18, 2004, de Santibañes gave notice that he would bring on a motion to be heard that the case be dismissed against him "for lack of personal jurisdiction" on April 2, 2004, or as soon thereafter as the court might hear the matter. On March 24, 2004, plaintiffs moved to remand the case to the Circuit Court of Fairfax County. Also, on March 24, 2004, plaintiffs moved the court to require de Santibañes to submit to deposition at the offices of plaintiffs' attorney in Fairfax, Virginia. The motion to take the deposition was denied by order of the magistrate judge, entered April 23, 2004, and on April 23, 2004, the court heard argument on de Santibañes' motion to dismiss himself from the case for want of personal jurisdiction, and, as well, as an appeal from the order of the magistrate judge denying the motion to take de Santibañes' deposition, which order was entered on account of the failure of plaintiffs to appear to prosecute their motion.
 
 
 37
 During this period of time, between March 5, 2004 and April 23, 2004, on April 8, 2004, an affidavit was filed by de Santibañes with respect to his absence of contacts with Virginia, which affidavit is copied into this opinion in Part III, note 4. Up until the time of that hearing, on April 23, 2004, plaintiffs had filed no opposition to de Santibañes' motion to dismiss.[5] Neither had any affidavit been filed by the plaintiffs to contradict the affidavit of de Santibañes. So de Santibañes' affidavit stands uncontradicted.
 
 
 38
 The theory of obtaining personal jurisdiction by the showing of a conspiracy so that a conspirator not present in the forum State will, nevertheless, be adjudged to have had a personal presence in the forum State by means of adequate minimum contacts of the other conspirators therein, has been addressed to some extent by the circuits. And, an article in the Fordham Law Review has considered the question. See Althouse, The Use of Conspiracy Theory to Establish in Personam Jurisdiction: a Due Process Analysis, 52 Fordham Law Review, 254 (1983).
 
 
 39
 In this circuit the case of McLaughlin v. McPhail, 707 F.2d 800 (4th Cir.1983), is so nearly on point as to be controlling. In McLaughlin, the plaintiff had sued three defendants, charging they were engaged in a fraudulent conspiracy. The defendants moved to dismiss the case "for lack of in personam jurisdiction." The court accepted the conspiracy theory as a means of showing sufficient contacts with the State of Maryland to authorize in personam jurisdiction. But the plaintiff offered "nothing but his bare allegations" that the defendants had had sufficient contacts with the State of Maryland. The court adopted the rule that the plaintiff in such a case is required to make a threshold showing that a conspiracy existed and that the defendants participated therein. McLaughlin, 707 F.2d at 807. Because there was no evidence of a conspiracy, the court affirmed the decision of the district court which had dismissed the case for lack of in personam jurisdiction. And because there had been no facts introduced to support a prima facie case showing a conspiracy by the defendants, the court also affirmed the decision of the district court as it denied the defendant's motion to compel the testimony of one of the defendants.
 
 
 40
 In the case of First Chicago Int'l. v. United Exchange Co., Ltd., 836 F.2d 1375 (D.C.Cir.1988), that court upheld the decision of the district court that "due process precludes the exercise of personal jurisdiction of [some of] the . . . defendants." 836 F.2d at 1377. The claim of the plaintiff was that the court had jurisdiction over a first foreign defendant through the agency of a second foreign defendant and a domestic defendant, the three of whom had conspired to injure the plaintiff bank. The conspiracy charged was of a check kiting scheme engaged in between three conspirators to the detriment of the plaintiff bank. The plaintiff, however, had fallen short of making a prima facie case of the check kiting conspiracy. The opinion recited, "[t]here is no concrete evidence in the record indicating that there was a common plan . . ." 836 F.2d at 1378. The court reasoned that such a plaintiff must allege specific facts connecting the defendant with the forum and that "the bare allegation of conspiracy or agency is insufficient to establish personal jurisdiction," citing McLaughlin, 707 F.2d at 806 (4th Cir.1983). 836 F.2d at 1378-79. The holding of the court was that the District did "not have personal jurisdiction over the UNEXCO defendants." So our decision in McLaughlin was followed by the D.C. Circuit. First Chicago also depended for support in its reasoning upon Lehigh Valley Indus. v. Birenbaum, 527 F.2d 87 (2d Cir.1975), for the statement that "New York law seems to be clear that the bland assertion of conspiracy or agency is insufficient to establish jurisdiction for the purposes of § 302(a)(2)." 527 F.2d at 93-94.[6]
 
 
 41
 In our case, as the district court recognized, there are no facts in the record as to Virginia contacts which serve to contradict the affidavit of de Santibañes. We are aware that in the various cases on this subject, some of them may have turned on the failure or success in complying with a long-arm or like statute. But however phrased, the McLaughlin case and the First Chicago case are both decided on the lack of personal jurisdiction, which is the issue here, not whether or not service of process was sufficient. We follow those cases.
 
 
 42
 The judgment of the district court is accordingly
 
 
 43
 
 AFFIRMED.
 
 
 
 
 Notes:
 
 
 [1]
 Miss Lolavar married her attorney in this case, Bruce Fein, on May 15, 2004, and her name was changed to Mattie Fein. For consistency with the record and the briefs, we refer to her by her maiden name
 The charges and counter-charges related here are from the papers in the court file, as are the other facts.
 
 
 [2]
 That docket sheet does not indicate any addition or deletion of parties, neither does it preclude such addition or deletion. We take judicial notice of the records of a court of record. It was not included in the record on appeal
 
 
 [3]
 A motion for judgment is the Virginia counterpart of a federal complaint. Cf. Fed. R.Civ.P. 3 with Va. Sup.Ct. R. 3:3
 
 
 [4]
 The essential terms of the affidavit follow:
 FERNANDO de SANTIBAÑES declares pursuant to 28 U.S.C. § 1746 and under penalty of perjury under the laws of the United States of America that the following is true and correct:
 
 
 [1]
 I am named as a defendant in the above captioned matter. I make this declaration in support of my motion to dismiss this action for lack of personal jurisdiction in that I did not have any contacts with the Commonwealth of Virginia which would justify this court or the courts of the Commonwealth of Virginia from exercising jurisdiction over me. The facts set forth below refer to all times material to the Motion for Judgment in this action right up until the present
 
 
 [2]
 I am a citizen and resident of Argentina
 
 
 [3]
 I have never lived, worked or maintained an office in Virginia
 
 
 [4]
 I never subscribed to a telephone in Virginia
 
 
 [5]
 I have never held any license, including a driver's license, issued by Virginia
 
 
 [6]
 I was not a party to any contract with either of the plaintiffs
 
 
 [7]
 I have never owned any real or personal property in Virginia
 
 
 [8]
 I have never held any bank accounts or other assets in Virginia
 
 
 [9]
 I have never conducted or operated any business in Virginia
 
 
 [10]
 I have never had any employees in Virginia
 
 
 [11]
 I have never sued anyone or been sued in Virginia
 
 
 [12]
 I have never met with the plaintiff Mattie Lolovar in Virginia. The only time I met her was on a social occasion at a friend's home in New York or Connecticut. I have never had any direct relationship with either of the plaintiffs. I have never directed either of the plaintiffs to perform any work in Virginia or elsewhere
 
 
 [13]
 Except on the one social occasion mentioned above, I have never communicated with the plaintiffs or transmitted any money to either of the plaintiffs
 
 
 [14]
 I have never communicated in Virginia by telephone, email, fax, letter or otherwise with the plaintiffs or any other defendant
 
 
 [5]
 Any transcript of that hearing is not a part of the record
 
 
 [6]
 Section 302(a)(2) refers to a section of the New York Civil Practice Law and Rules that specifically provides that personal jurisdiction attaches where "a non-domiciliary . . . who in person orthrough an agent . . . commits tortious act within the state." N.Y.C.P.L.R. § 302.