Marcilea FLETCHER, Appellant,

v.

Allison Jennifer BLAIR; Patricia Huntington, a/k/a Patience Huntington; Brett James Strasma; and Paula Kay Galbraith, Appellees.

No. 3–91–077–CV.

Court of Appeals of Texas,
Austin.

Aug. 12, 1992.

Rehearing Overruled Oct. 28, 1992.

Dissenting Opinion of Justice Powers on Denial of
Rehearing Oct. 28, 1992.

Jay Doyle, Kuhn, Doyle & Kuhn, P.C., Austin, for appellant.

John F. Williams, Clark, Thomas, Winters & Newton, Austin, for Allison Jennifer Blair.

John Greytok, Fulbright & Jaworski, Austin, for Patricia Huntington.

Brantley Ross Pringle, Jr., Bankston, Wright & Greenhill, Austin, for Brett James Strasma.

Douglas W. Alexander, Brown McCarroll & Oaks Hartline, Austin, for Paula Kay Galbraith.

Before POWERS, JONES and B.A. SMITH, JJ.

JONES, Justice.

This is an appeal from an order of dismissal following the imposition of so-called "death penalty" discovery sanctions. The district court dismissed the cause after striking appellant Marcilea Fletcher's pleadings for alleged discovery abuse. Tex.R.Civ.P.Ann. 215 (Supp.1991). In two points of error, Fletcher alleges that the district court erred by: (1) abusing its discretion in striking her pleadings and dismissing the cause; and (2) depriving her of her claim without federal due process and state due course of law.

Fletcher filed the underlying lawsuit for personal injuries she allegedly sustained while she was a passenger in a vehicle

appellee Allison Jennifer Blair was driving. Blair's vehicle collided with two other vehicles driven by appellees Brett James Strasma and Paula Kay Galbraith. Fletcher claims she suffered closed-head injuries, severe headaches, broken teeth, thoracic-outlet syndrome requiring surgery, cervical injuries, numbness and tingling in parts of her body, and potential carpal-tunnel syndrome. In addition to the three drivers, Fletcher sued appellee Patricia Huntington, a/k/a Patience Huntington, for negligent entrustment of her vehicle to Blair.

During discovery, Fletcher falsely claimed on two occasions that she had received bachelor's and master's degrees from The University of Texas and was working towards a doctorate degree. After discovering the falsity of these claims, appellees filed a joint motion for sanctions based on Fletcher's statements, and the district court struck her pleadings.[1] The dismissal is effectively with prejudice because the two-year statute of limitations has run on Fletcher's claim. Tex.Civ.Prac. & Rem.Code Ann. § 16.003 (1986). At the hearing on Fletcher's motion for new trial, appellees claimed that Fletcher also misrepresented her past income on her tax returns. Fletcher originally claimed that the errors in her tax return resulted from her lack of access to her tax records and her impaired memory, but admitted at the hearing that she knew she was giving false information in response to the appellees' interrogatories. The district court denied Fletcher's motion for new trial on January 24, 1991.

■ The supreme court changed the law regarding "death penalty" sanctions during the pendency of this appeal. *See Trans-American Natural Gas Corp. v. Powell*, 811 S.W.2d 913 (Tex.1991). We believe the district court should have the opportunity to reconsider the rulings of which appellant complains in light of *TransAmerican*. We will, therefore, vacate the district court's order of dismissal and remand the cause. *See Welex v. Broom*, 816 S.W.2d 340 (Tex. 1991).

■ The dissent contends that this Court lacks the power to nullify the district court's order of dismissal without first finding error. We disagree. Contrary to the dissent, we believe that the verbs "vacate" and "reverse" have different meanings. "Reverse" is properly used only when the higher court first determines that the lower court committed an error of law. "Vacate" is properly used in at least the following circumstances: (1) when a court nullifies its own judgment, ruling, or order (synonymous in this sense with "set aside" or "withdraw"); (2) when an appellate court nullifies the judgments, rulings, or orders of the courts below because the parties have settled, or the cause has otherwise become moot on appeal; and (3) when an appellate court reaches a decision in one cause on a novel legal issue, the appellate court may, without finding error: (a) nullify the judgments of the courts below in a different, second cause involving the same novel legal issue; and (b) remand that second cause to the appropriate court below for further consideration if the second cause was pending on appeal at the time the appellate court reached its decision on the relevant legal issue in the first cause (known as "vacating in light of ...").[2]

■ In the third example given above, it is not necessary for the appellate court to find error, because the court below was relying on the then-existing law when it rendered its judgment, ruling, or order. Whether the court below actually committed "error" in such a situation is more a question of semantics and legal philoso-

1. Because none of the parties has raised the issue on appeal, we assume without deciding that Fletcher's conduct was a proper subject for sanctions under Rule 215.

2. An intermediate appellate court may also vacate and remand in light of the decision of a higher appellate court. Two examples of this principle would be the instant cause and a case in which the Texas Supreme Court or the Court of Criminal Appeals of Texas vacates and remands in light of a decision of the United States Supreme Court.

phy.[3] Vacating the judgment, ruling, or order and remanding the cause for further consideration in light of the "new" law spares all participants the time and effort of searching for such after-the-fact "error." Although this procedure is not specifically mentioned in Texas Rule of Appellate Procedure 80(b), we hold that this Court has the inherent power to render such a judgment.[4]

Accordingly, without addressing the merits of the appeal, we vacate the district-court order of dismissal and remand the cause to that court for further proceedings in light of *TransAmerican.*

POWERS, Justice, dissenting.

The majority purport to nullify ("vacate") a trial-court judgment without first finding that it results from reversible error; indeed, the majority do so consciously and expressly without "addressing the merits of the appeal." We have no power to nullify in this manner a trial-court judgment that is presumed on appeal to be free of error and valid in all respects. I therefore dissent.

## THE MAJORITY OPINION

Fletcher perfected an appeal from a trial-court default judgment imposed as a discovery sanction. She contended the judgment was erroneous under *TransAmerican Natural Gas v. Powell,* 811 S.W.2d 913 (Tex.1991), a decision published by the supreme court *after* entry of the default judgment against Fletcher. The parties joined issue on Fletcher's three assignments of error. The cause was submitted in this Court for decision, after oral argument, based on Fletcher's claim that the record she furnished us on appeal demonstrated reversible error under *TransAmerican.*

The majority have declined to consider whether the record demonstrates reversible error. Therefore, they may not "reverse" the presumably correct and errorless judgment, for Texas Rule of Appellate Procedure 81(b) expressly precludes a reversal except on a finding of reversible error in the record. Tex.R.App.P.Ann. 81(b) (Pamph.1992). The majority determine then to "vacate" the trial-court judgment— to nullify that judgment *irrespective* of whether the record shows a reversible error.

## DISCUSSION

From what source does this Court derive the power to take such an extraordinary action against a presumably error-free and correct judgment? The majority offer the following as a precept applicable to appellate review in Texas:

[W]hen an appellate court reaches a decision in one cause on a novel legal issue, the appellate court may, *without finding error:* (a) nullify the judgments of the courts below in a different, second cause involving the same novel legal issue; and (b) remand that second cause to the appropriate court below for further consideration if the second cause was pending

---

**3.** The aggrieved party must, of course, preserve the alleged error. *See* Tex.R.App.P.Ann. 52 (Pamph.1992).

**4.** The Court of Criminal Appeals of Texas frequently disposes of causes in this manner, as does the Supreme Court of the United States. *E.g., Stringer v. Black,* 494 U.S. 1074, 110 S.Ct. 1800, 108 L.Ed.2d 931 (1990) (vacating and remanding for consideration in light of *Clemons v. Mississippi,* 494 U.S. 738, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990)); *Haynie v. State,* 751 S.W.2d 878 (Tex.Crim.App.1988) (vacating and remanding for consideration in light of *Rose v. State,* 572 S.W.2d 529 (Tex.Crim.App.1988)). The Texas Supreme Court disposed of *Welex* in this manner, although we admit we do not understand why the supreme court remanded the cause to the court of appeals instead of to the

trial court, as the appeal involved a matter entrusted to the trial court's discretion as opposed to a pure question of law. Nevertheless, the supreme court did not imply that on remand the court of appeals was precluded from taking such action itself. *See Welex v. Broom,* 816 S.W.2d 340 (Tex.1991); *see also Bacon v. General Devices, Inc.,* 830 S.W.2d 106 (Tex.1992).

We are not aware of any specific authorization in either the Texas Rules of Appellate Procedure or the Code of Criminal Procedure for the actions of the court of appeals or the supreme court, nor are we aware of any specific authorization in either the Federal Rules of Appellate Procedure or the Rules of the Supreme Court for the actions of the United States Supreme Court.

on appeal at the time the appellate court reached its decision on the relevant legal issue in the first cause (known as "vacating in light of ...").

(emphasis added). The majority contend this power of an appellate court is an "inherent" power, and its exercise is indicated by use of the word "vacate" instead of the word "reverse." [1] Such is the exclusive reasoning and basis for the majority holding in this appeal.

The majority give no reasoning and cite no authority for the precept upon which they decide this appeal; it is, indeed, a novel precept so far as I am able to determine.[2] One might even say that the precept is revolutionary, for heretofore the law has always been very clear that we *must* reverse or affirm a trial-court judgment as dictated by the new law intervening after a trial-court judgment and before our decision on appeal—a matter discussed below.

The majority do refer to two decisions in which a *court of last resort* vacated the judgment of an *intermediate appellate court,* then remanded the appeal to *that* court for further consideration in light of a controlling decision published by the highest tribunal following the trial of a case. *Stringer v. Black,* 494 U.S. 1074, 110 S.Ct. 1800, 108 L.Ed.2d 931 (1990); *Haynie v. State,* 751 S.W.2d 878 (Tex.Crim.App.1988). To these, one might add the more relevant decision in *Welex v. Broom,* 816 S.W.2d 340 (Tex.1991). One must note, however, that these decisions do *not* refer at all to the matter of an "inherent" power; nor do they suggest the precept, upon which the majority rely in declining to decide this appeal, as one applicable to an intermediate appellate court such as ours. Rather, the majority employ these decisions merely in a circular course of reasoning: If a court of last resort may nullify the judgment of an intermediate appellate court when a change of law intervenes after trial, without finding error, then an intermediate appellate court must have the power to do the same thing with regard to a trial-court judgment;

---

1. When one speaks of the "inherent" power of a court, one refers to a power not derived from legislative grant or specific constitutional provision. Such a power arises in the court simply from the fact that it was created a "court" and charged by the constitution and statutes with certain duties and responsibilities. The court may call upon such a power to aid in the exercise of its jurisdiction, in the administration of justice, and in preserving its independence and integrity. *See Eichelberger v. Eichelberger,* 582 S.W.2d 395, 398 (Tex.1979). "Inherent" powers include the power to change, set aside, or otherwise control the court's *own* judgments; the power to summon and compel the attendance of witnesses; the power to punish by contempt; the power to regulate admission to the bar and the practice of law; and the power to provide personnel to aid the court in the exercise of its judicial function. *Id.* n.1. These statements are *dicta* in *Eichelberger,* which involved rather the question of an "implied" power. The court was merely distinguishing between "inherent" and "implied" powers. One notes, however, that the novel "inherent" power claimed by the majority in the present case is distinctly different in kind from those listed.

   It is possible that the majority attribute their holding in some measure to the word "vacate," as if it implies *in and of itself* something different from the word "reverse." There is no such difference in the present context. The idea content of both words is identical—a nullification of the trial-court judgment so that it is deprived of legal effect as a judgment. *See* Bryan A.

Garner, *A Dictionary of Modern Legal Usage* 398 (1987) (entry "overrule; overturn; reverse; set aside; vacate"); 5 Am.Jur.2d *Appeal and Error* § 948, at 374 (1962); 77 C.J.S. *Reverse* 335–36 (1952). To erect an inherent power upon a basis so thin as a supposed substantive distinction between the two words, if that is what the majority intend, suggests serious doubt in and of itself as to the existence of such a power. The matter becomes almost conclusive when one considers that our intermediate appellate courts have operated for 100 years without claiming such a power or giving a hint of its existence.

2. The majority's omission to limit the scope of the new inherent power, claimed for this Court, raises serious questions as to the relationship between trial courts and courts of appeal. May we "vacate" the trial-court judgment in every appeal in which a change of law intervenes pending our decision, remanding the cause to the trial court *without* applying the new law as we have a duty to do under the decisions cited in the text of this opinion? *Must* we "vacate" the trial-court judgment in those instances; or does the matter lie within our discretion, and, if so, what are the limits of our discretion and what are the factors that should govern our decision one way or the other? It has never before been necessary to consider these matters because such a novel power has never before been claimed by an intermediate appellate court.

further, there being no express authority to take such action, we must of necessity have such authority as an "inherent" power. *This is not the law. It is the opposite of the law. We have no such power.*

It should go without saying that we can have no inherent power that is inconsistent with our express powers and the general framework that governs our decisionmaking as an intermediate appellate court. That framework consists of the applicable provisions of our state constitution, statutes, and rules of procedure, interpreted in the controlling judicial decisions by our highest courts. It includes the following rules governing appellate review in our court:

1. "It is well settled that an errorless judgment of a trial court cannot be reversed in the interest of justice or to permit the losing party to have another trial." *Uselton v. State,* 499 S.W.2d 92, 99 (Tex. 1973).

2. We must presume the trial court judgment is correct and free of error until we determine that the record of trial-court proceedings, furnished us by the party who would show error, reveals otherwise; we may not presume the judgment below is erroneous or incorrect. *Hoover v. General Crude Oil Co.,* 147 Tex. 89, 212 S.W.2d 140, 143 (1948).

3. We may render the following "types of judgments" in deciding a perfected appeal in which we have jurisdiction; *affirm* the trial-court judgment; *modify* the trial-court judgment by correcting or reforming it; or *reverse* the judgment below, and *if we reverse* it, dismiss the cause, render the judgment the trial court should have rendered, or remand the cause for further proceedings in the trial court.[3] Tex.R.App. P.Ann. 80(a) (Pamph.1992).

4. We *may not reverse* a trial-court judgment for an error of law unless it amounts to a "reversible error," that is to say, an error that "amounted to such a denial of" appellant's rights "as was reasonably calculated to cause and probably did cause rendition of an improper judgment in the case." Tex.R.App.P.Ann. 81(b) (Pamph.1992).

5. When the law on a material point changes after the trial-court judgment but before our decision on appeal, we have a *duty* to determine the question of reversible error under the new state of the law unless it would impair vested rights under the earlier law. If the trial-court judgment is errorless under the new law, we *must* affirm it; if the record shows reversible error under the new law, we *must* reverse the trial-court judgment. And *if we reverse* the trial-court judgment, we may, in our discretion and in the interests of justice, remand the cause for reconsideration under the new law even though we would ordinarily render the judgment the trial court should have rendered.[4] *Sadler v. Sadler,* 769 S.W.2d 886, 887 (Tex.1989); *Scott v. Liebman,* 404 S.W.2d 288, 294 (Tex.1966); *see also Houston Lighting &*

---

**3.** In Texas Rule of Appellate Procedure 81(c), we are instructed that we "shall proceed to render such judgment or decree as the court below should have rendered, except when it is necessary to remand to the court below for further proceedings." Tex.R.App.P.Ann. 81(c) (Pamph.1992). When, then, is it "necessary" so to remand the cause to the trial court? One instance is, of course, when remand is necessary "in the interest of justice." *Scott v. Liebman,* 404 S.W.2d 288, 294 (Tex.1966). Apart from such cases, it is our *"duty* to render the judgment which the trial court should have rendered" unless we conclude the trial-court judgment is "uncertain" or the circumstances require additional development of the evidence. *Mobil Oil Corp. v. Frederick,* 621 S.W.2d 595, 596 (Tex.1981) (emphasis added); *see also Lone Star Gas Co. v. Railroad Comm'n,* 767 S.W.2d 709, 710 (Tex.1989). No party seeks remand in the present cause, and no party contends the trial-court judgment is uncertain or that additional evidence is required in the circumstances. In any case, as pointed out in the text, the question of remand does not even arise absent a *decision* to *reverse* the trial-court judgment, a judgment the majority refuse to render. *See* Tex.R.App. P.Ann. 80(b)(3), (4) (Pamph.1992).

**4.** The change in law may come either from a new decision by the highest court in the jurisdiction or from a new statute. Whether to apply the new law, on appeal, might depend on the terms of the court decision or statute. *See generally* P.H. Vartanian, Annotation, *Change of Law After Decision of Lower Court as Affecting Decision on Appeal or Error,* 111 A.L.R. 1317 (1937).

*Power Co. v. Dickinson,* 641 S.W.2d 302, 311 (Tex.App.1982, writ ref'd n.r.e.) ("An appellate court must apply the law in effect at the time of its decision.").

It is self-evident that the inherent power claimed by the majority contradicts directly all the foregoing propositions that govern decisionmaking in an intermediate appellate court such as ours. The majority expressly decline even to inquire whether the record on appeal shows reversible error under the law existing after *TransAmerican.* They nullify a subsisting trial-court judgment that is presumed as a matter of law to be correct and free of error under the old and the new law. They neither affirm, nor reverse, nor modify the trial-court judgment. Because of these contradictions, the inherent power cannot be imputed to this Court.[5]

But did not the supreme court in *Welex* do precisely what the majority propose here to do, and is that not implied authority for such an inherent power? After all, *Welex,* too, is part of our governing framework.

The answer is "No" for the following reasons. In *Welex,* the supreme court did *not* vacate the trial-court judgment and remand the cause to the trial-court for reconsideration in light of *TransAmerican.* Instead, the supreme court vacated the judgment of the *court of appeals* and remanded the cause to *that* court for a decision on the merits of the appeal, under the new law existing after *TransAmerican.* This course permitted an appellate *decision* under the new law, enabling the court of appeals to perform its duty and preserving the parties' statutory right to obtain a decision based on the record of trial proceedings in a perfected appeal. Indeed, the court of appeals proceeded after remand to discharge its duty to decide the appeal under *TransAmerican:* the court of appeals *held* that the record showed reversible error under the new law laid down in *TransAmerican, reversed* the trial-court judg-

ment rendered before *TransAmerican,* and *remanded* the cause to the trial court. *See Welex v. Broom,* 823 S.W.2d 704 (Tex.App. 1992, writ denied). This is, of course, precisely the method to be employed by an intermediate appellate court under longstanding Texas precedents and rules of procedure, as discussed above.

The consequences are entirely different under the majority opinion here, *which denies the parties' statutory right to obtain a decision in a perfected appeal*—a decision whether under *TransAmerican* the final judgment in the trial court must be set aside for reversible error shown in the record of trial proceedings furnished us on appeal.

It is our duty to decide the appeal and our duty to decide it under *TransAmerican.* Without making a decision on the merits under *TransAmerican,* however, the majority nakedly and summarily put an end to this appeal by nullifying, on their own initiative, a presumably errorless judgment as surely as if they had reversed it on a finding of reversible error in the record furnished us. This is not only unfair to the parties, it is contrary to the express provisions of law that govern our decisionmaking. We have no power to do it. I would affirm the trial-court judgment for reasons not necessary to detail in light of the majority decision.

For the reasons given, I dissent.

### ON MOTION FOR REHEARING
Rehearing overruled.

### DISSENTING OPINION ON DENIAL OF REHEARING

[Filed Oct. 28, 1992]

POWERS, Justice, dissenting.

I dissent from the overruling of the appellees' motions for rehearing. An appellee requests that I give the reasons upon

---

5. One must bear in mind that the right of appeal is *not* an "inherent" right, but one provided and governed by statute or rules of procedure. *See Salvaggio v. Brazos City Water Control,* 598 S.W.2d 227, 229 (Tex.1980); *Dipuccio v. Hanson,*

233 S.W.2d 863, 866 (Tex.Civ.App.1950, no writ). The effect of the majority opinion is to deny the parties' statutory right to obtain an appellate decision under the applicable statutes and rules.

which I would affirm the trial-court judgment. I believe it a justifiable request.

## SCOPE OF REVIEW

The trial-court sanction order resulted in a judgment dismissing Fletcher's cause of action. Fletcher contends on appeal that the dismissal sanction was (1) an abuse of discretion (2) depriving her of due process and due course of law under the federal and state constitutions. There is, however, no due process violation if Fletcher's conduct justified a presumption that her claim lacked merit. *See TransAmerican Natural Gas Corp. v. Powell*, 811 S.W.2d 913, 918 (Tex.1991). If the trial judge properly applied Texas Rule of Civil Procedure 215(2)(b) in Fletcher's case, the necessary presumption arose. *See Insurance Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinea*, 456 U.S. 694, 707, 102 S.Ct. 2099, 2106, 72 L.Ed.2d 492 (1982). Consequently, Fletcher's constitutional claims depend entirely upon her abuse-of-discretion claim—a question of law based in this instance upon undisputed facts. *Insurance Corp. v. Metropolitan Hockey Club, Inc.*, 427 U.S. 639, 642, 96 S.Ct. 2778, 2780, 49 L.Ed.2d 747 (1976); *Vaughn v. Texas Employment Comm'n*, 792 S.W.2d 139, 142–43 (Tex.App.—Houston [1st Dist.] 1990, no writ).

I should point out two additional matters affecting our review. The trial judge's choice of sanctions under Rule 215 is presumed to be valid; the burden lies upon Fletcher to bring us a record showing the contrary. *Simon v. York Crane & Rigging Co.*, 739 S.W.2d 793, 795 (Tex.1987). Nevertheless, Fletcher brings us a record without findings of fact or conclusions of law indicating the reasoning upon which the trial judge chose the dismissal sanction. In our consideration of the abuse-of-discretion claim, we must therefore view the evidence in a light most favorable to the trial court's choice and indulge every legal presumption in favor of it. *Vaughn*, 792 S.W.2d at 143. Fletcher must show that the trial court's choice of sanctions cannot be supported by *any* legal theory raised by the evidence. *Point Lookout West, Inc. v. Whorton*, 742 S.W.2d 277, 279 (Tex.1987).

As indicated below, Fletcher has made no such showing in my opinion.

## THE DUTY OF THE TRIAL JUDGE TO SUPPLY A STATEMENT THAT SHE CONSIDERED LESSER SANCTIONS

In support of Fletcher's claim that the trial court abused its discretion, she complains that the trial judge did not supply a statement in the record that she considered lesser sanctions before choosing that of dismissal. Fletcher contends *TransAmerican* imposed upon trial judges the legal duty to supply such a statement. *TransAmerican* did not impose a legal duty of that character; rather, it expressly declined to do so by stating that the trial judge was not obliged to make written findings of fact demonstrating the mental process by which the judge reached its choice of sanctions. *TransAmerican*, 811 S.W.2d at 919 n.9. The opinion also rejected the notion by necessary implication because the decision in *TransAmerican* does not rest upon what the record in the case *failed* to show; rather, the decision rests upon what the record *did* show. The record "established" affirmatively "that the severe sanctions the district court imposed against TransAmerican were *manifestly* unjust." *TransAmerican*, 811 S.W.2d at 919 (emphasis added).

In any case, the record in Fletcher's case shows affirmatively that the trial judge did consider lesser sanctions before imposing finally the sanction of dismissal. Fletcher urged expressly in her motion for new trial several alternative sanctions short of dismissal. She argued forcefully for these in the subsequent hearing. The trial judge's order overruling the motion for rehearing declared expressly that she had considered the motion for new trial and Fletcher's argument in that connection. The meaning and effect of this order are that the trial judge considered and rejected the propriety of a lesser sanction. *See* 4 Roy W. McDonald, *Texas Civil Practice in District and County Courts* § 17.10.1, at 90–91 (Frank W. Elliott ed., rev. ed. 1982).

For these reasons I would overrule Fletcher's contention that the trial judge abused her discretion by omitting to supply a record statement that she considered a lesser sanction before imposing that of dismissal.

## THE REQUIREMENT OF A JUST SANCTION

Fletcher argues, in effect, that the trial court abused its discretion because the dismissal sanction was unjust in light of what *TransAmerican* required before that sanction might be imposed.

A sanction must be "just." Tex.R.Civ.P. 215(2)(b); *TransAmerican*, 811 S.W.2d at 917. This statement means several things: (1) "a direct relationship [must exist] between the offensive conduct and the sanction imposed"; (2) the chosen sanction "must not be excessive"; (3) the sanction must result from a "reasoned analysis of the purposes sanctions serve and the means of accomplishing those purposes"; and (4) if the dismissal sanction will amount (as in Fletcher's case) to an adjudication of the offender's claim without a trial, the offender's conduct must amount to "flagrant bad faith." *TransAmerican*, 811 S.W.2d at 917, n.6, 918.

There can be no question that there exists a direct relationship between Fletcher's offensive conduct and the sanction imposed. This leaves for discussion the interwoven issues of whether the dismissal sanction was excessive, whether it resulted from a reasoned analysis of the purposes served, and whether it was based on Fletcher's "flagrant bad faith." I turn first to the question of "flagrant bad faith." Lying under oath is "bad faith" by definition.

The *TransAmerican* opinion adopted the flagrant bad-faith requirement from the decision in *National Hockey League v. Metropolitan Hockey Club*, 427 U.S. 639, 642–43, 96 S.Ct. 2778, 2780–81, 49 L.Ed.2d 747 (1976). *See TransAmerican*, 811 S.W.2d at 918. In *National Hockey League* the Supreme Court sustained the trial court's finding of flagrant bad faith where the offending party failed to obey an order to answer an opposing party's written interrogatories for a period of seventeen months. If a mere omission of that character constitutes flagrant bad faith, for the purposes served by the discovery sanctions, the trial court in Fletcher's case could reasonably conclude that her affirmative conduct, amounting to an element of perjury, constituted flagrant bad faith. *See Vaughn*, 792 S.W.2d at 142–43.

Was the dismissal sanction arrived at by a reasoned analysis of the purposes served by the discovery sanctions and their accomplishment? The purposes to be served by the discovery sanctions are three: (1) securing compliance with the rules of discovery; (2) punishing parties who violate the discovery rules; and (3) deterring others from such violations. *Bodnow Corp. v. City of Hondo*, 721 S.W.2d 839, 840 (Tex. 1987). As stated above, we have not been provided findings of fact and conclusions of law. I am left then to ascertain whether such an analysis may fairly be inferred from the evidence on any legal theory. *Point Lookout West, Inc.*, 742 S.W.2d at 279.

Fletcher makes three basic arguments for holding that the dismissal sanction was excessive and, therefore, could not be the product of a reasoned analysis.

### I.

Fletcher contends first that Rule 215 did not apply to her case at all because her conduct did not come within that rule. She reasons that her lying about her educational attainments did not constitute a hindrance to discovery; rather, she merely supplied false evidence in advance of trial which might furnish a topic for cross examination at the trial itself. I disagree entirely. Fletcher's contention amounts to an invocation of the discredited and rejected notion of a "sporting theory of justice" that has no place in our legal system.

Merely to state the purpose of the discovery rules demonstrates that Fletcher's conduct came within the rules. "Mutual knowledge of all the relevant *facts* gathered by both parties is *essential* to proper litigation." *Hickman v. Taylor*, 329 U.S.

495, 507, 67 S.Ct. 385, 391, 91 L.Ed. 451 (1947) (emphasis added). The discovery rules "have modified the trial-by-battle techniques of the common law by procedures which seek to make litigation not merely a battle of wits between opposing counsel, each intent upon *concealing* as long as possible his *power*, but rather a genuine effort to arrive at the actually disputed issue by a mutual disclosure of *strength* before trial." 2 Roy W. McDonald, *Texas Civil Practice in District and County Courts* § 10.02, at 420 (Frank W. Elliott ed., rev. ed. 1982) (emphasis added). The discovery rules were intended to be "[e]ffective pretrial procedures which clear away the tangle of unfounded claims and defenses and non-essential collateral disputes, and reveal the *actual force of the position of each litigant* [and] are likely in the long run to produce a fairer disposition of litigation." *Id.* (emphasis added). The discovery rules have the purpose of establishing a "comprehensive system for the pretrial discovery of the *evidentiary facts* ... and the pretrial *development of evidence* to be used at the trial thereof." *Id.* at 421 (emphasis added). There can be little dispute that discovery answers are required to be under oath in order to effectuate these purposes and inhibit the supplying of false evidence.

Fletcher hindered discovery and failed to comply with a proper discovery request because she did not supply true information about her educational attainments, a material matter. That she lied in the process demonstrated unequivocally her bad faith in the matter, and it also established favorable, but false, information that would bolster her case on damages and perhaps credibility while misleading any fact finder, the trial court, and any appellate court. Her fabricated "evidence" inflated the strength of her case over its true strength. She created rather than cleared away an unfounded claim. I would hold her conduct fell squarely within Rule 215.

## II.

Fletcher argues next that her fabrication of evidence occasioned no harm to her opponents in litigation because they ultimately learned the truth from their own investigations; and when they confronted Fletcher with the truth, in a third discovery attempt, she freely admitted lying and freely admitted the truth of what her opponents had learned.

I believe it correct to say that prejudice to opposing parties *is* a proper consideration bearing on the justness of the sanction chosen by the trial court. But it is not the only factor to be considered in that regard; it must be considered and weighed in conjunction with *all* the relevant factors bearing upon what is necessary to achieve the purposes of deterrence and punishment, after the purpose of compliance passed from the case by Fletcher's admitting the truth. I will discuss this matter below in conjunction with Fletcher's third argument.

## III.

Fletcher argues finally that the sanction of dismissal does not further any of the three purposes of discovery sanctions. I disagree entirely, believing the purposes of deterrence and punishment are essential to be effectuated in the present case and that the trial judge could reasonably conclude in light of all of the relevant factors that no sanction short of dismissal would accomplish them. Certainly, her conclusion is not shown by this appellate record to be a manifest abuse of discretion, as was the case in *TransAmerican*.

Had the trial court merely foreclosed Fletcher's recovery of a part of her damages, which Fletcher suggests as a possible "available" sanction that was more proportionate to her conduct, I believe that result would only encourage lying under oath by other litigants and convert serious legal proceedings into a costly game unworthy of any legal system: "What may I risk lying about without losing too much if I'm caught?" There is no deterrent at all and no punishment of Fletcher's conduct under such a proposed sanction. That sanction would only encourage other litigants to take calculated risks because Fletcher lost only what she chose to put at risk by her

lying. This hardly comports with any rational idea of a "penalty." Fletcher would not sustain a penalty if she lost only what she put at risk, and no more. It is not a penalty to lose what one chances in a gamble. It is simply a "bet."

It is, of course, possible that Fletcher would afterwards be truthful in giving evidence in the course of the litigation, having suffered only a lesser sanction. But other parties in other lawsuits will take it as an invitation to gamble on extending their evidence beyond the truth, after balancing the risks of having their deceit discovered. Shall this be the practice in our legal system? If so, we have resurrected the "sporting theory of justice" that we thought buried by the discovery rules. Simultaneously we have degraded our legal system to an extent that it is not worthy of public reliance in serious matters.

The effect upon the courts weighs heaviest of all the relevant factors in my view. It is a factor that must be considered extremely important in assessing whether the trial judge abused her discretion in choosing the sanction she did.[1] I do not see how a court system can operate at all except on a premise that the system actually works based upon .truthful evidence and an assumption that witnesses who are sworn to be truthful in their evidence habitually and routinely are. Fletcher attempted to trade to her advantage upon that very assumption while slitting its throat in secret. I cannot hold that dismissal of her lawsuit, for such conduct, was a manifestly improper application of Rule 215(b)(2).

In the absence of findings of fact and conclusions of law, I would affirm the trial-court judgment on the legal theory given above. I therefore dissent from the majority decision overruling the appellees' motions for rehearing.

---

1. "Weakened confidence in our parliament would be formidable, but confidence destroyed in courts of justice would be taking out the linch-pin." John, Viscount Morely, *Notes on Politics and History* (1913).