**ADOLPH COORS COMPANY,**
a Colorado corporation,
Plaintiff,

v.

**AMERICAN INSURANCE COMPANY, a Nebraska corporation; Federal Insurance Company, an Indiana corporation; Fireman's Fund Insurance Companies, a California corporation; Liberty Mutual Insurance Company; a Massachusetts corporation; and Truck Insurance Exchange, a California inter-insurance exchange, Truck Underwriters Association, Attorney-in-Fact, Defendants.**

Civil A. No. 92 N 61.

United States District Court,
D. Colorado.

March 4, 1993.

508

Russell Carparelli, Jim M. Hansen, Bradley, Campbell, Carney & Madsen, Golden, CO, Joseph D. Tydings, Edward M. Joyce, Nicholas J. Zoogman, Anderson Kill Olick & Oshinsky, P.C., New York City, for Adolph Coors Company.

Christen A. Mattison, Hall & Evans, Denver, CO, for Federal Insurance Co.

James K. Green, Joyce L. Jenkins, Montgomery Green Jarvis Kolodny & Markusson, Denver, CO, Charles K. O'Neill, Peter N. Hillman, Cheryl A. Hughes, Chadbourne & Parke, New York City, for Republic Insurance Co.

Randy D. Kotel, Cook & Kotel, Denver, CO, Patrick M. Shine, Law Offices of John J. Fitzgerald & Associates, Chicago, IL, for American Insurance Co. and Fireman's Fund Insurance Cos.

Thomas L. Roberts, Pryor, Carney & Johnson, P.C., Englewood, CO, Gregory B. Kanan, Rothgerber, Appel, Powers & Johnson, Denver, CO, for Liberty Mutual Ins. Co.

Marc Robert Levy, Suzanne Lambdin, Michael Thomas Sabin, Levy & Lambdin, P.C., Englewood, CO, for Truck Insurance Exchange and Truck Underwriters Association.

Victoria S. Price, Assistant Counsel, Liberty Mutual Insurance Company, Boston, MA.

Bridget A. Kelly, Caron & Fitzgerald, Chicago, IL, for Fireman's Fund Ins. Co.

## ORDER AND MEMORANDUM OF DECISION

NOTTINGHAM, District Judge.

Adolph Coors Company has filed suit seeking a declaratory judgment against various insurance companies which have insured it over the years. Coors seeks a ruling that the insurance companies are obligated (1) to defend Coors in certain environmental litigation arising out of Coors' disposal of wastes at the Lowry Landfill near Denver, Colorado and (2) to pay any damages awarded against Coors in this underlying environmental litigation. The case, originally filed in Colorado state court, was properly removed pursuant to 28 U.S.C.A. § 1441(a) (West Supp.1992). Jurisdiction is based on 28 U.S.C.A. § 1332(a) (West Supp.1992).

This matter is currently before the court on "Plaintiff Adolph Coors Company's Notice of Motion to Impose Sanctions Against Liberty Mutual Insurance Company" filed on January 29, 1993. I held a hearing on this motion on February 18, 1993. After reviewing the lengthy briefs and considering oral argument, I conclude that Liberty Mutual has willfully violated the court's discovery rulings and that issue preclusion is an appropriate sanction for the violations. In particular, I hold that Liberty Mutual can no longer deny the existence of a duty to defend Coors from claims asserted against Coors in the underlying environmental litigation.

From the start, this litigation has been extremely acrimonious. Numerous discovery disputes have resulted in a plethora of motions to compel and motions for protective orders filed by all sides. Each motion was normally accompanied by a staggering amount of paper in the form of exhibits. Many of the motions involved petty squabbling that should have been resolved among the attorneys without the court's involvement. Refereeing these fights has been very time-consuming and vexing for the court.

To be sure, Liberty Mutual has not been involved in each and every discovery dispute which has come before the court. The disputes in which it has been involved, however, have differed from disputes involving other parties. After ruling on a dispute involving other parties, I rarely, if ever, heard of the dispute again. I infer from this circumstance that the litigants satisfactorily complied with the ruling and moved the litigation forward, even though they might well have disagreed with the ruling. As to Liberty Mutual, however, my review of the file and the events of the past eight months leaves me with the firm conviction that Liberty Mutual's approach to the discovery process as a whole involves delay, obstruction, obfuscation, and disingenuity. Its interpretation and treatment of discovery rulings—which, viewed in a light most favorable to Liberty Mutual, has been airily and haughtily cavalier—is but one aspect of this overall approach. If the name of the game is "hardball litigation," Liberty Mutual qualifies as a major league team.

I make this preliminary observation primarily to explain that the specific discovery dispute underlying Coors' current motion for sanctions must be viewed against the background of Liberty Mutual's other behavior during the discovery phase of this lawsuit. Liberty Mutual's central contention concerning the current motion for sanctions is that its acknowledged failure to produce documents is the product of good-faith misunderstanding, understandable confusion, and inadvertent failure to focus on the terms of the document request—not a willful and intentional disregard of the court's orders. A party's state of mind, of course, must be gleaned from *all* the circumstantial evidence, not just from counsel's self-righteous protestations of innocence when caught in the glare of a motion for sanctions which ineluctably demonstrates a failure to comply with discovery orders. When reciting the facts concerning this specific discovery dispute, I will occasionally animadvert to other events which are relevant only because they shed light on the

state of mind with which Liberty Mutual approaches its discovery obligations.

## FACTS

The long and tortured history of this particular discovery dispute stretches back to June 1992. On June 3, Coors' counsel deposed Mr. William Urmston, a Liberty Mutual senior claims supervisor. Counsel attempted to question Mr. Urmston about alleged admissions made by Liberty Mutual concerning insurance which Liberty Mutual had sold to United Technologies Corporation ("UTC"). Liberty Mutual's counsel instructed Mr. Urmston not to answer, since Liberty Mutual's counsel was unsure whether any protective orders were in force in certain litigation involving UTC and Liberty Mutual. Counsel for Liberty Mutual represented that he would try to resolve this issue before the deposition resumed the next day. *Plaintiff Adolph Coors Company's Notice of Motion to Impose Sanctions Against Liberty Mutual Insurance Company,* ex. B, *Deposition of William E. Urmston* at 191–96 (filed Jan. 29, 1993) [hereinafter *Coors' Motion* ].

The deposition continued the next day without any further information having been obtained regarding the UTC matter. At that point, Coors' counsel marked, as Exhibits B–13 through B–16, four Liberty Mutual documents which referenced claims against UTC for pollution at "dump sites." These memoranda also set forth Liberty Mutual's position on coverage. Coors had not obtained these documents from Liberty Mutual. Mr. Urmston was once again instructed not to answer any questions about these documents. These documents were sealed and placed in the custody of the court reporter so that the status of the documents could be determined. *Coors' Motion,* ex. B at 202–05.

As of June 2, when Coors' first commenced examination concerning the UTC documents and the UTC claims in general, the four documents identified in the previous paragraph *were not in fact the subject of any protective order or "confidentiality" order in any litigation,* although their status appears to have been unclear to those attending the deposition. Coors' counsel voluntarily truncated his examination on June 2 upon the express representation of Liberty Mutual's counsel that Liberty Mutual would, before Mr. Urmston's deposition resumed at 3:00 o'clock p.m. on June 3, clarify whether the documents were covered by a protective order. *Coors' Motion,* ex. B at 195–96. As I have previously noted, the issue remained unresolved as of June 3, so the four documents were sealed in the hands of the shorthand reporter.

Although Coors did not know it at the time, much more than "clarification" was occurring. On June 3, Liberty Mutual's counsel in UTC's litigation with Liberty Mutual was writing to other counsel in that litigation, claiming that the four documents in question had been "inadvertently produced by Liberty Mutual without having been designated CONFIDENTIAL." *Coors' Motion,* ex. D, *Letter from Kim Marrkand to Numerous Counsel dated June 3, 1992.* Apparently acting pursuant to a protective order in the UTC litigation which permitted parties to designate whatever they wanted as "confidential" (subject, presumably, to review by the UTC court in the event of a dispute), Liberty Mutual's counsel demanded that other counsel stamp their copies of the document "confidential"—making the documents thenceforward subject to a confidentiality order in the UTC litigation.

Subsequent to the Urmston deposition, Coors served Liberty Mutual with a formal request for the production of documents. Request A2 pertained to the UTC documents:

A. Produce each of the following documents which is in your possession, custody or control, as identified or referred to in the deposition of William E. Urmston, taken by Coors on June 2nd and 3rd, 1992:

. . . .

2. *All written materials distributed to claims supervisors concerning the following issues:* general claims practices and procedures; handling of pollution claims; handling of asbestos and toxic tort claims; *United Technologies Corporation claims.*

*Coors' Motion,* ex. E at 2 (emphasis supplied). Coors also provided page number

references to the deposition testimony in order to aid Liberty Mutual, but not to narrow its request.

On July 22, 1992, Liberty Mutual served its response to Coors' document request. It objected to the request on the grounds that it was overbroad, burdensome, and sought proprietary information. *Exhibits to Defendant Liberty Mutual's Response in Opposition to Plaintiff Adolph Coors Company's Motion to Impose Sanctions Against Liberty Mutual,* ex. E (filed Feb 9, 1993) [hereinafter *Liberty Mutual's Exhibits* ]. It furnished no responsive documents. Because I think Liberty Mutual's response to the second document request, taken as a whole, indicates something about its intent and state of mind on discovery issues, I will more fully discuss the response in a later section of this decision.

After service of the essentially useless response to the document request, the parties exchanged letters which made a vain attempt to resolve the problem. Since each party basically maintained its position, I would ordinarily regard the letters as unremarkable. Liberty Mutual seizes on one letter, however, as evidence demonstrating that Coors, by remaining silent, misled Liberty Mutual concerning what it really sought by way of the document request now at issue. The letter in question was written to a Coors' attorney by a Liberty Mutual attorney on September 16, 1992. Almost in passing, the Liberty Mutual attorney makes the astonishing observation that Request A1 and Request A2 seem to ask for the same documents—and then proceeds to redefine the request in terms different from *either* A1 *or* A2. *Coors' Motion, ex. G, Letter from Dykstra to Gasior dated Sept. 16, 1992.* Coors never responded to this assertion, and Liberty Mutual now takes the position that this silence misdirected discovery from that point forward.

Even if Coors' silence misdirected Liberty Mutual, the court's ruling on Coors' motion to compel should have showed it the path again. Coors brought the motion to compel on October 16, 1992. I granted the motion in open court on October 22, 1992: "So you produce all the *Remington* material and respond to what's in the second set of document requests." *Transcript of October 22,* *1992 Hearing* at 18. I went on to specifically enumerate that documents specified in requests A2, A3, A4, A5, A6, A7, A8, A11, A13, and A14 were all to be produced. *Id.* The basis of my ruling was that this information was either relevant or could lead to relevant information. Fed.R.Civ.P. 26(b)(1). I also indicated a willingness to award attorney's fees with regard to this matter, but did not do so because Coors did not press the issue at that time. *Transcript of October 22, 1992 Hearing* at 20.

This ruling did not end the matter. The parties continued to wrestle over what was required by the bench ruling of October 22. Liberty Mutual persisted in attempting to misuse protective orders entered in other litigation by insisting that it would produce documents which it had previously produced in other litigation only after consulting the court and parties in the other litigation. *Plaintiff Adolph Coors Company's Notice of Motion to Compel Discovery and to Impose Sanctions,* ex. C, *Letter from Zboyan to Joyce dated Oct. 28, 1992* (filed Dec. 3, 1992) [hereinafter *Coors' Original Sanctions Motion* ]. On November 5, 1992, Coors notified the court that Liberty Mutual had not yet produced the material covered by the court's October 22, 1992, order. At that time, I warned Liberty Mutual that if it did not comply with the court order, sanctions would be imposed. *Transcript of November 5, 1992 Hearing* at 30.

Liberty Mutual's intransigence lingered. It produced some of the documents covered by the court order (the so-called *Remington* documents), but it claimed that Coors' use of these documents would be limited not only by the protective order which I have entered in this case, but also by all other existing protective orders. *Coors' Original Sanctions Motion,* ex. G. Coors properly rejected this limitation. *Id.,* ex. H.

Liberty Mutual correctly observes that the court and the parties were focusing in October and November primarily on the *Remington* documents and the National Risk Bulletins which were covered by the order of October 22. Liberty Mutual suggests that it was misled by this emphasis into ignoring the UTC materials which are currently at

issue. This suggestion is spurious, for it was Liberty Mutual itself which shifted the focus by misleading the court concerning issues other than the *Remington* documents and the National Risk Bulletins. On November 30, 1992, Liberty Mutual filed a motion asking the court to reconsider parts of its October 22 ruling. In this motion it expressly recited that "Liberty Mutual has complied with this Court's ruling of October 22, 1992 *by producing all of the documents requested in Coors' Second Request for Production of Documents* and by producing all of the Coors-specific 'Remington Documents.'" *Liberty Mutual's Motion for Clarification or for Reconsideration of the Court's Ruling of October 22, 1992 as it Relates to Liberty Mutual's National Risk Documents* ¶ 2 (filed Nov. 30, 1992) (emphasis supplied).

At a third hearing, upon learning that the documents referenced above had still not been produced, I finally imposed a $10,000 sanction on Liberty Mutual:

> I've reviewed the documents. I've reviewed my previous oral orders. Liberty Mutual's motion for clarification is denied. I don't know how much clearer I could have made this, and how much clearer I could have made it that I expected compliance with the order. We're beyond the point now where it's proper to argue relevance or seek clarification or argue that something may fall on the borderline.
>
> The question now is whether this Court's orders are going to be complied with, and I'm not interested anymore in the question of whether the particular documents at issue would be ordered produced if we were back in October and we were debating that question again. The question is whether Liberty Mutual can simply ignore, and drag its feet in defiance of, this Court's orders to produce documents.
>
> Coors' motion to compel, filed December 3rd, is granted. Its motion to impose sanctions is granted. I have told Liberty Mutual twice now that sanctions were going to be imposed if the orders were not obeyed.

*Transcript of December 10, 1992 Hearing* at 4.

This sanction still did not solve the problem. With the persistence of Kipling's Yellow Dog Dingo pursuing Old Man Kangaroo, Coors chased Liberty Mutual. On December 15, 1992, after Liberty Mutual had provided supplemental responses to Coors' *third* request for documents (but not to the *second* request), Coors insisted on supplementation of the *second* request. It reiterated this request on December 17, in response to Liberty Mutual's claim earlier on December 17 that it was in full compliance with the court's orders. *Liberty Mutual's Exhibits,* ex. S, *Letter from Roberts to Joyce dated Dec. 17, 1992* and ex. U, *Reply from Joyce to Roberts dated Dec. 17, 1992.* Liberty Mutual attributed this omission to an oversight and promised supplementation of the second document request by December 21. *Id.,* ex. V, *Letter from Roberts to Joyce dated Dec. 17, 1992.* Although the exhibits are not entirely clear, Liberty Mutual evidently supplied Coors with an *unsigned* supplemental response, on or about December 21, 1992. *See Coors' Motion* at 9; *Defendant Liberty Mutual Insurance Company's Amended Response in Opposition to Plaintiff Adolph Coors Company's Motion to Impose Sanctions Against Liberty Mutual* at 14 (filed Feb. 11, 1993).

On January 15, 1993, Liberty Mutual at last served a fully-executed copy of supplemental responses to Coors' second set of requests for documents, including request A2, on Coors. It certified that "Liberty Mutual has produced all documents responsive to Request No. 2 by virtue of its physical production of documents *and* by virtue of the authorization to Coors for the review of *Remington* documents produced in FMC." *Coors' Motion,* ex. J at 1 (emphasis supplied). It is plain from the conjunctive language of this response that Liberty Mutual did not regard the *Remington* documents as encompassing everything requested by Coors in the second request.

The issue concerning the UTC documents was still unresolved. The only documents which Coors "had" at that point relating to UTC claims were the four documents that had been sealed at the Urmston deposition. It is debatable whether Coors "had" these materials, since Liberty Mutual's conduct

wholly prevented Coors' use of the documents in this lawsuit. Liberty Mutual had still not produced those documents, nor any others relating to UTC. Once Coors brought this to Liberty Mutual's attention, Coors asserts, Liberty Mutual's counsel admitted that the UTC material had not been produced. *Coors' Motion*, ex. L, *Letter from Gasior to Zboyan dated Jan. 22, 1993* (confirming conversation in which Liberty Mutual's counsel admitted that the UTC documents had not been produced as ordered by the court on October 22, 1992). Liberty Mutual's counsel denied willfully not producing the documents. Rather, she attributed this to a "miscommunication," saying that Liberty Mutual had not understood request A2 to include the "UTC claims file." *Liberty Mutual's Exhibits*, ex. B, *Affidavit of JoAnne M. Zboyan* ¶ 16. Assuming, as I do, that the "UTC claims file" plainly includes material distributed to claims agents concerning United Technologies Corporation claims, the argument is incredible. There is no reasonable way to construe the request as excluding materials in the UTC claims file.

At that point, despite strenuous objections from Liberty Mutual's counsel, Coors' counsel canceled depositions of Liberty Mutual personnel that had been scheduled for the following week. *Coors' Motion*, exs. L, M. Liberty Mutual then faxed the four so-called Urmston documents to Coors' counsel and for the first time authorized their use in depositions. *Coors' Motion*, ex. M, *Letter from Roberts to Gasior dated Jan. 23, 1993*. This letter also stated "[i]f there are any other documents responsive to your Request No. 2 regarding UTC, we are informed that they would be so few in number that total cancellation of the scheduled depositions cannot be justified by production now." *Id.*

The saga continued on January 28, when Liberty Mutual dribbled out yet another faxed transmission to Coors of documents relating to UTC. These 31 pages were sent by Liberty Mutual's counsel who stated that "[w]hile we do not believe that any of these documents are responsive to Request No. 2, we provide them because of your adamant refusal to be any more specific with regard to the request." *Liberty Mutual's Exhibits*, ex.

NN, *Letter from Roberts to Joyce and Gasior dated Jan. 29, 1993*. On the same day, Coors filed its motion for sanctions.

I conclude these findings by reciting an event which occurred less than a week before the hearing on the motion currently before me. On February 12, 1993, Liberty Mutual acknowledged that it had still not produced all the documents responsive to Coors' *Remington* document request—nearly four months after this court unequivocally ordered production and after twice claiming that it had already produced all such materials. Even then, it claimed that it would produce such materials only subject to protective orders in other litigation.

## ANALYSIS

■ Before addressing the current arguments directly related to the sanctions issue, I will discuss an issue which only peripherally applies to the motion before the court, yet is very telling about Liberty Mutual's attitude toward its discovery obligations and the discovery process in general. Even a cursory examination of the facts I have set forth indicates a consistent problem—namely, Liberty Mutual's misuse of protective orders entered in other litigation. The most glaring example arises from the debate concerning the UTC documents that occurred during the Urmston deposition. It is important to underscore what Liberty Mutual accomplished by this maneuver and to understand how it has tried to turn the discovery rules upside down by misusing the protective order which apparently exists in the UTC litigation. The four documents at issue are plainly documents which were created by Liberty Mutual and which have existed in the files of Liberty Mutual since they were created; they are *not* documents which Liberty Mutual obtained from any other party during discovery in the UTC litigation. *See Coors' Motion*, ex. C (the four documents in question). In light of the usual purpose and operation of a protective order, the distinction is a significant one. A protective order of this sort is generally entered, under a provision such as Fed. R.Civ.P. 26(c), to restrict the use which a party can make of information *which it obtains by virtue of the discovery process*. If,

for example, UTC had produced a document sought by Liberty Mutual in the UTC litigation, stating that it was producing the document only under the terms of a protective order, then Liberty Mutual would be required to use the document only in accordance with the terms of the protective order. By invoking the terms of the protective order, Liberty Mutual could similarly restrict the use which *other parties to the UTC litigation* could make of "confidential" information produced by Liberty Mutual. In short, a protective order is intended to operate as the producing party's shield *against the receiving party's misuse of protected information.* It is not intended to operate as a sword which the producing party can thereafter wield in other litigation by urging that it has once produced the requested documents under a protective order and that any later production or use of the documents in the other litigation is therefore excused, precluded, or subject to the earlier protective order.

On June 2 and 3, Liberty Mutual effectively sought to make use of the UTC protective order as a sword in this litigation. Its conduct on June 2 and 3 was simply dilatory and obfuscating, from beginning to end. Coors was deposing a Liberty Mutual employee, and it sought to use documents which plainly originated in Liberty Mutual's own files. Even if the person delivering them to Coors were somehow violating a protective order in the UTC litigation, the proper remedy for that wrong would have been a motion for contempt or other relief in the UTC case, not a pointless attempt to prevent questions about them in this case. The real issues pertinent to this case were: (1) whether Coors' use of the Liberty Mutual documents *in this litigation* should be somehow restricted and (2) whether Coors' examination of Mr. Urmston was touching on areas so confidential or sensitive that access to the transcript of his deposition should likewise be restricted. Having reviewed the documents, I find it hard to discern any valid basis for claiming that they were somehow privileged or protected from discovery in this litigation, aside from Liberty Mutual's *ipse dixit.* They are not covered by the attorney-client privilege; they are not work product; they do not

disclose any information which could reasonably be regarded as a trade secret. The *most* which Liberty Mutual could properly argue would be that they contained sensitive information about a Liberty Mutual policyholder, United Technologies Corporation. If Liberty Mutual had entertained a genuine concern about the confidentiality or sensitivity of its documents or of the areas which Coors was probing, that concern could easily have been met by forthrightly disclosing the problem to Coors, designating the documents and transcript as "confidential" pursuant to a protective order which I have entered in this litigation, and/or redacting from the documents information which would have identified UTC as the policyholder.

Instead, Liberty Mutual chose to delay, obstruct, and misdirect. Although the documents in question were Liberty Mutual's own documents, Liberty Mutual's counsel vaguely suggested that they might be the subject of a protective order in the UTC litigation, thereby implying that someone had violated the protective order by delivering them to Coors and that Coors might be violating the protective order by further using them in this litigation. The misdirection ploy worked, for the objection interposed at the deposition by Liberty Mutual's counsel delayed Coors from pursuing its inquiry until there could be a "clarification." Instead of clarifying, Liberty Mutual unilaterally designated the documents as "confidential" in the UTC case and thereby confirmed the propriety of its obstructive insistence that they be sealed in the hands of the shorthand reporter in this litigation. The protected status of the documents in the UTC litigation was a red herring, for the UTC protective order could not excuse Liberty Mutual from producing *its own documents* in this litigation, nor could it prevent Coors from examining Liberty Mutual's own employees concerning knowledge which they possessed independently of the UTC litigation—subject, of course, to protective orders entered by the court in this litigation. Given the timing of the letter written by Liberty Mutual's counsel in the UTC litigation (and Liberty Mutual does not claim that the timing was a mere coincidence), I find that Liberty Mutual's letter in the UTC case was

precipitated not by any genuine, coincidental desire to protect the documents from misuse by parties in the UTC litigation (misuse which had not in fact occurred, since there had been no "confidential" designation), but to prevent their further use by Coors in the litigation before this court. This misuse of protective orders is but one way in which Liberty Mutual reveals the state of mind with which it approaches discovery. I will allude to others as I proceed through its arguments.

In opposition to Coors' motion, Liberty Mutual makes three types of essentially-factual arguments, none of which I find have a great deal of merit. Liberty Mutual's chronology and explanation of its behavior exhibit no inclination to abide by the letter or spirit of the discovery rules or the court's orders. I will first address Liberty Mutual's three arguments. I will then consider the propriety of the sanction requested here.

### Liberty Mutual's Three Factual Arguments

**1. Arguments Relating to Liberty Mutual's Good Faith in Complying with Second Request for Production A2**

█ In arguing that it did not willfully disobey the court order of October 22, 1992, Liberty Mutual emphasizes the fact that most of the discussion at the hearing on October 22 focused on the *Remington* documents. It also observes that much of the later contact between the parties' attorneys, and hearings before the court, centered on these documents and the National Risk materials. *Liberty Mutual's Response* at 10–14. Liberty Mutual simply does not address the fact that it was also ordered to produce categories of documents which clearly encompassed the UTC claims. Liberty Mutual was in the best position to know what documents it had and to decide whether such documents were responsive to the request. As I have observed in reciting the facts surrounding the formal response which Liberty Mutual finally served on January 15, Liberty Mutual surely did not think that the *Remington* documents contained everything responsive to Coors' second request. Thus, production of the *Remington* documents did

not excuse the court-ordered obligation to search for and supply other responsive documents as well.

As to Coors' silence on the matter of the UTC documents, Liberty Mutual's argument is deficient in two respects. First, it was Liberty Mutual, more than Coors or the court, which was responsible for diverting attention from the UTC documents—by suggesting on November 30 that it had produced all documents responsive to the second request except for the National Risk documents. Second, Coors was clearly led to believe that the documents it sought were included in the *Remington* production. It could not be expected to know what was contained in the *Remington* production until it had a chance to examine the documents. In fact, given Liberty Mutual's emphasis on the large size of the *Remington* production, it would not have been unreasonable for Coors to think that some or all of the UTC documents requested were contained in that group of documents. *See Transcript of December 10, 1992 Hearing* at 8 (Liberty Mutual's representation that the *Remington* production consists of almost 100,000 documents). Therefore, I find that Coors specifically objected to Liberty Mutual's non-production of the UTC materials at the earliest possible opportunity—once it had a chance to examine the *Remington* documents and to go back and consider that Liberty Mutual had surely misstated the matter when it claimed to be in full compliance with its discovery obligations.

Liberty Mutual also seems to assert that Coors' second request for production of documents was unclear. Liberty Mutual relies on the earlier-mentioned letter in which it interpreted request A2 to be the same as request A1. *Liberty Mutual's Response* at 9.

> Request for Production No. 1 and Request for Production No. 2 appear to request the same documents, namely written materials prepared and distributed to claims supervisors in connection with seminars given by Mr. Urmston and other presenters.

*Liberty Mutual's Response*, ex. G, *Letter from Dykstra to Gasior dated Sept. 16, 1992.* I briefly address this piece of sophistry. Liberty Mutual argues that no communica-

tions from Coors contradicting this statement were received. The observation is groundless, for the two requests simply do not ask for the same documents and could not be reasonably interpreted as seeking the same documents. Coors, however, did not take issue with the observation, and Liberty Mutual now claims that Coors' silence was somehow misleading. I disagree. If the Liberty Mutual lawyer had made the observation that a horse chestnut is essentially the same as a chestnut horse, I doubt that anyone would treat Coors' failure to respond as acquiescence in the observation or would be misled by Coors' silence. The observation which the lawyer did make was only slightly less absurd, and I will treat Coors' failure to respond accordingly. The most critical shortcoming of Liberty Mutual's argument is its failure to note that on October 22, 1992, the court ordered production of the documents in request A2 *as written by Coors*, not as redrafted by Liberty Mutual at a later date.

A final observation concerning Liberty Mutual's argument that it has acted in good faith, not willfully or intentionally: I might find the assertion more plausible as to this particular incident if the record revealed, on the whole, a party with an intent to follow the letter and spirit of the discovery rules. Such a record would permit the reasonable inference that this was an isolated, accidental, inadvertent misunderstanding. The record reveals nearly the opposite. For example, Liberty Mutual's responses to document requests illustrate the state of mind with which Liberty Mutual approaches discovery. In responding to the vast majority of requests, Liberty Mutual (1) interposed a number of identical boilerplate objections, (2) invited Coors to make a different, narrower request, and (3) stated that it *might* furnish materials responsive to the different, narrower request. The objection to the request for the UTC materials is illustrative:

> Liberty Mutual objects to this Request on the grounds that it is overly broad, unrestricted in duration or subject matter, unduly burdensome, seeks proprietary information which is not relevant to the subject matter of this lawsuit and not calculated to lead to the discovery of admissible evidence [sic]. Subject to and without waiver

of this objection, if plaintiff can narrow its request to materials involving handling of landfill claims from 1990, the date on which plaintiff first gave notice to Liberty Mutual of its involvement with the EPA concerning the Lowry Landfill for many years prior, defendant *may reconsider* this request to the extent that such materials exist and provided they do not relate to any other Liberty Mutual insured.

*Id.* at 2 (emphasis supplied).

This response is all too typical, not only of Liberty Mutual's response to this set of document requests, but also of its responses to other requests which I have reviewed during the course of resolving discovery disputes over the past eight months. As applied to Coors' specific request at issue here (quoted in full earlier), the objections are truly baseless. More importantly, they appear to be standard objections which Liberty Mutual makes to a majority of discovery requests. When one sees the same obstructive pattern time and again, as I have in addressing discovery disputes involving Liberty Mutual, one begins to infer that such a response is calculated, not to facilitate the exchange of information or to point up a real problem with the request, but to turn the discovery process into a gauntlet in which only the most wealthy, determined, and fit opponent can wearily stumble across the finish line.

In sum, Liberty Mutual consistently obstructs these proceedings by misusing protective orders in other litigation; it interposes baseless boilerplate objections to request after request, claiming essentially that the request is so broad and meaningless as to render response impossible; it attempts to redefine and narrow the request, suggesting (but not promising) that it *may* respond to the new request if its opponent will abandon the original request; it further delays the proceedings by maintaining its baseless position throughout the meet-and-confer conferences required by this court's local rules, producing not a single responsive document throughout the process; when finally ordered to comply with the request as written, it continues to delay by claiming partial compliance, seeking reconsideration on grounds already considered and rejected, and simply

ignoring court-ordered deadlines. Its tactics confront the court and its opponent with a Hobson's choice: if the request is not phrased so as to demand specific documents, it objects on the ground that the request is too broad; if the court focuses on a particular category of documents (e.g., the *Remington* materials), it produces only those specific materials and then argues that it did not know other materials were desired.

Liberty Mutual suggests that it is unfair for the court to consider Liberty Mutual's conduct prior to imposition of the $10,000 sanction on December 10. The argument is that Liberty Mutual was chastened by that sanction and has reformed its conduct, rendering unnecessary the further sanction now sought by Coors. Even if the argument were accepted, its factual premise—that Liberty Mutual has reformed its conduct—is contrary to the record. Liberty Mutual continues to dribble out documents as the discovery process is in its twilight hours. It continues to misuse protective orders in other litigation by insisting on compliance with those orders as a condition of production. Most importantly, it has further delayed proceedings by abusing this court's meet-and-confer rule, a topic to which I now turn.

### 2. Liberty Mutual's Arguments Concerning Coors' Failure to Satisfy its Local Rule 403G Duty to Confer

■ Liberty Mutual defends its actions by saying that Coors did not mention the absence of UTC documents in the production supplied by Liberty Mutual until Coors canceled depositions in late January 1993. It also insists that, since it was first sanctioned on December 10, it has sought continually to have Coors specify particular documents which it had allegedly failed to produce. An affidavit filed by Liberty Mutual's counsel summarizes its position:

> I requested Mr. Joyce [Coors' counsel] to advise me whether he was aware of any other documents, specifically or by category, that he thought might still be due as a result of the Court's order, and if so, to inform me immediately so we could avoid any further dispute over discovery and assure compliance with the Court's orders.

He declined to do so, saying he did not know what documents Liberty Mutual had, and instead, requested that the company should just file a written representation that it had complied with the production order when it believed it had.

*Liberty Mutual's Exhibits,* ex. A, *Affidavit of Tom Roberts* ¶ 8. Liberty Mutual claims that this is a violation of local rule 403G, which imposes a duty upon attorneys to confer in order to work out their disputes.

Local rule 403G (the version effective in this case, since the case was filed before June 1, 1992) provides:

> Unless otherwise ordered, the court will not entertain any motion under Rules 26(c) and 37, F.R.Civ.P. unless counsel for the moving party has conferred or has made reasonable effort to confer with opposing counsel concerning the matter in dispute before the filing of the motion. Counsel for the moving party shall file a certificate of compliance with this rule with any motion filed under Rules 26(c) and 37(a) F.R.Civ.P.

D.Colo.R. 403G. This rule, which is similar to many other meet-and-confer rules throughout the country, usually serves a salutary purpose. Discovery disputes are frequently the result of inadvertent ambiguity in the discovery request or misapprehension concerning what is required by the request. The propounding party may sometimes ask for more documents than the party really needs. In most cases, these and other problems can be resolved, without court intervention, by frank discussion among the lawyers.

Liberty Mutual has abused rule 403 here; indeed, it has turned the rule on its head. The rule is not a device which permits a party to interpose blanket boilerplate objections to perfectly proper questions and then obdurately discuss the matter to death in a vain attempt to avoid going to court; yet that is exactly what Liberty Mutual did here. The correspondence prior to the court's October 22 order reveals parties firing verbal sallies from entrenched positions, with no trace of an attempt to compromise. This battle of correspondence ended with the court's order of October 22, when I overruled all of Liberty Mutual's objections and or-

dered it to respond to the requests (including request A2) as written.

Since December 11, Liberty Mutual's abuse of rule 403G has assumed a slightly different form. On that date, I denied Liberty Mutual's motion for reconsideration, stated that I regarded the court's orders as unambiguous, and ordered for the third time that the documents be produced. Placing to one side its previous arguments, objections, and other acts and omissions, Liberty Mutual (which has had no fewer than five apparently-able attorneys involved in this litigation) was surely obliged at that point to put the collective heads of its lawyers and agents together, to reassess the document requests covered by the court orders, to give those requests a reasonable construction, *to conduct the search for documents required by rule 34*, and to produce responsive documents. Had it done so promptly after the bench ruling of December 10, it would have found the UTC documents, the *Remington* materials which surfaced the week before the hearing, and perhaps (since the UTC documents themselves refer to still other unproduced materials) other responsive documents. Instead, Liberty Mutual adopted the strategy of claiming (falsely, as it turned out) that it had produced all documents and *demanding, under the guise of rule 403G correspondence, that Coors specify what documents Coors thought Liberty Mutual had not produced.* Rule 403G simply cannot be used to shift the burden of production in this manner.

I therefore find that Coors' counsel acted properly in refusing to acquiesce in this burden-shifting tactic. Coors' counsel have no access to Liberty Mutual's files and cannot ascertain what documents may or may not exist. Even Liberty Mutual's counsel, by asking Coors' counsel for guidance as to compliance with court orders, seems to claim ignorance as to what is contained in Liberty Mutual's files. *See Liberty Mutual's Exhibits*, ex. A, *Affidavit of Tom Roberts* ¶ 8. It is disingenuous for Liberty Mutual to assert that, since Coors' counsel did not specifically mention the UTC documents at some earlier juncture, Liberty Mutual was somehow excused from having to produce the UTC documents.

On this record, I find that Coors has adequately complied with rule 403G. Coors had clearly set forth its request for the UTC documents at the time of the Urmston deposition and the subsequent formal written request for production. A motion to compel was followed by this court's October 22 order directing Liberty Mutual to produce the requested documents. After Liberty Mutual had at last unequivocally asserted, in its formal response on January 15, that it had fully complied with the court's order regarding request A2, Coors clearly replied that it still did not have the UTC documents. *Coors' Motion*, ex. K, *Letter from Gasior to Roberts dated Jan. 21, 1993*. A number of phone calls were traded among counsel for the opposing parties. *Plaintiff Adolph Coors Company's Reply to Defendant Liberty Mutual Insurance Company's Response in Opposition to Plaintiff Adolph Coors Company's Motion to Impose Sanctions Against Liberty Mutual* ¶ 15–21 (filed Feb. 12, 1993) [hereinafter *Coors' Reply* ]. Finally, on January 23, 1993, Liberty Mutual *reasserted* its position that it had fully produced all documents relating to request A2. *Coors' Motion*, ex. M, *Letter from Roberts to Gasior dated Jan. 23, 1993* ¶ 2. Three paragraphs later in the same letter, Liberty Mutual contradicted this position by airily stating, "[i]f there are any other documents responsive to your Request No. 2, we are informed that they would be so few in number that total cancellation of the scheduled depositions cannot be justified by production now." *Id.* ¶ 5. In yet another letter, Liberty Mutual asserted that it did not understand request no. 2 to include "UTC claims files" but rather "materials concerning the handling of claims." *Coors' Motion*, ex. M, *Letter from Roberts to Joyce and Gasior dated Jan. 28, 1993*. From the record before me, it does not appear that either "UTC claims files" *or* "materials concerning the handling of [UTC] claims" have been produced. Given this contradictory, equivocal series of letters, Coors did not act inappropriately in terminating the "dialogue" and filing the instant motion.

### 3. Liberty Mutual's Arguments Concerning Relevancy of the UTC Documents

Liberty Mutual argues that "Coors' characterization of the UTC documents as highly probative and dispositive of the coverage issues is disingenuous." *Liberty Mutual's Response* at 19. This argument is truly irrelevant at this point in the litigation. First of all, Liberty Mutual's estimation of relevancy is not probative of anything in this case. Second, I have already found that the UTC material is either relevant or likely to lead to relevant information. *See Transcript of October 22, 1992 Hearing* at 20; *Transcript of December 10, 1992 Hearing* at 4. I first made this finding nearly four months ago, and it is incredible that Liberty Mutual is still attempting to resurrect this horse that has been beaten to death.

### The Propriety of Issue Preclusion as a Remedy

The heart of Liberty Mutual's position is that issue preclusion is not an appropriate sanction in this case. Coors' motion argues that issue preclusion pursuant to rule 37 is a proper remedy in this case. I begin the discussion by turning to the text of the rule:

> If a party ... fails to obey an order to provide or permit discovery, including an order made under subsection (a) of this rule or Rule 35, ... the court in which the action is pending may make such orders in regard to the failure as are just, and among others the following:
>
> ....
>
> (C) An order striking out pleadings or parts thereof, or staying further proceedings until the order is obeyed, or dismissing the action or proceeding or any part thereof, or rendering a judgment by default against the disobedient party.

Fed.R.Civ.P. 37(b)(2)(C). The Supreme Court has taken a strong stand on rule 37 sanctions:

> But here, as in other areas of the law, the most severe in the spectrum of sanctions provided by statute or rule must be available to the district court in appropriate cases, not merely to penalize those whose conduct may be deemed to warrant such a sanction, but to deter those who might be tempted to such conduct in the absence of such a deterrent.

*Nat'l Hockey League v. Metro. Hockey Club, Inc.,* 427 U.S. 639, 643, 96 S.Ct. 2778, 2781, 49 L.Ed.2d 747 (1976).

■ Coors is asking for preclusion on the issue of whether Liberty Mutual has a duty to defend Coors. *See Hecla Mining Co. v. New Hampshire Ins. Co.,* 811 P.2d 1083, 1089–91 (Colo.1991). A finding that Liberty Mutual has a duty to defend Coors would require Liberty Mutual to investigate, defend and mitigate any losses incurred by Coors at the Lowry Landfill. This amounts to a dismissal of one of Liberty Mutual's main defenses in this case and is essentially a partial judgment against Liberty Mutual. This is "an extreme sanction appropriate only in cases of willful misconduct.... [and] should be used as 'a weapon of last, rather than first, resort.'" *Ehrenhaus v. Reynolds,* 965 F.2d 916, 920 (10th Cir.1992) (quoting *Meade v. Grubbs,* 841 F.2d 1512, 1520, n. 6 [10th Cir.1988] ).

■ Determining whether dismissal is a proper sanction is a fact specific inquiry. *Id.* In making such a decision, the district court must chose a sanction that is both "just" and "related to the particular 'claim' which was at issue in the order to provide discovery." *Ehrenhaus,* 965 F.2d at 920 (quoting *Insurance Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee,* 456 U.S. 694, 707, 102 S.Ct. 2099, 2107, 72 L.Ed.2d 492 [1982] ).

■ Issue preclusion on the duty to defend fits the *Ehrenhaus* criteria. First, Liberty Mutual has willfully ignored not just one, but several, court orders. I have warned Liberty Mutual on several occasions that its defiance could lead to increasingly harsh sanctions. Therefore, the harsh remedy of issue preclusion is not only just; the situation virtually cries out for it. Second, the UTC documents that Coors has been attempting to procure through the court orders seem to contain discussions of Liberty Mutual's position with regard to coverage of pollution claims. *Coors' Motion,* ex C. In

particular, one Liberty Mutual memorandum pertaining to UTC states:

> Dump site cases, where the insured gave the pollutants to a third party in good faith, are considered sudden and accidental and coverage is afforded under the regular RG policy. If a claim is made against the insured to clean up a site by any governmental agency, including but not limited to a federal, state or municipal authority and there has been physical injury to tangible property, the Underwriting Department considers these clean up costs to be covered.

*Coors' Motion,* ex. C, *Memorandum from G. Schaffer dated Jan. 28, 1985.* Clearly, documents such as this seem to relate to the coverage issues that are pivotal in this case. To be sure, Liberty Mutual claims that the documents would be inadmissible at trial, because they do not pertain to a policy like Coors' policy. That, however, is a decision for the court to make at trial, after Coors has been given access to the materials and after both sides have had the chance to make fully-informed arguments; Liberty Mutual is not entitled to short-circuit this process (to its advantage) by withholding the documents. Since Liberty Mutual has refused to produce them, precluding its use of the "no duty to defend" defense is appropriate and related to the particular claim on which Liberty Mutual has resisted discovery. *See Insurance Corp. of Ireland,* 456 U.S. at 707, 102 S.Ct. at 2107.

■ In *Ehrenhaus,* the Tenth Circuit has identified five other factors which are important criteria in determining whether dismissal is a proper sanction. 965 F.2d at 921. Dismissal is appropriate "[o]nly when the aggravating factors outweigh the judicial system's strong predisposition to resolve cases on the merits." *Meade,* 841 F.2d at 1520, n. 7. Consideration of these factors demonstrate that this is indeed such a case.

*Actual prejudice to the other party*

The *Ehrenhaus* court mentions both delay and mounting attorney's fees as being prejudicial to the party seeking discovery. 965 F.2d at 921. Both of these factors are certainly present here. The delay in production of these documents has now extended to almost four months since the court's initial order to produce. Due to Liberty Mutual's non-compliance, the discovery cutoff, with regard to Liberty Mutual, has now been extended at least another month—and very likely even longer. *Transcript of February 4, 1993 Hearing* at 16.

There is no record as to the amount of the attorney fees that this delay has caused. The $10,000 sanction imposed on Liberty Mutual on December 10, 1992, was a rough estimate of the attorney fees incurred up to that point in December. This matter has dragged on for yet another eleven expensive weeks. Therefore, I conclude, under *Ehrenhaus,* that Coors has clearly been prejudiced.

*Interference with the judicial process*

I held earlier that Liberty Mutual has willfully violated this court's order. *See Transcript of December 10, 1992 Hearing* at 14. Today, I find that it continues to do so. In fact, Liberty Mutual's eleventh-hour production of UTC documents, while still arguing relevancy, shows that it had these documents in its possession and control. *Liberty Mutual's Response,* ex. NN. Therefore, I conclude that there has been substantial interference with the judicial process. In fact, I can not imagine what constitutes greater interference with the judicial process than willfully disobeying a court order. If Liberty Mutual is allowed to continue in the same vein, unsanctioned, administration of any type of orderly justice would be impossible. *See Ehrenhaus,* 965 F.2d at 921. The sort of conduct chronicled herein would inevitably be tacitly encouraged.

The facts here are easily distinguishable from those in *Meade v. Grubbs,* 841 F.2d 1512 (10th Cir.1988), cited by Liberty Mutual. In *Meade,* a plaintiff failed to respond to a motion to dismiss after a motion for extension of time in which to respond was denied. The Tenth Circuit held that it was an abuse of discretion to dismiss plaintiff's case with prejudice since plaintiff had answered an earlier motion to dismiss that had addressed virtually the same issues. A lesser sanction would have been appropriate given the lack of prejudice to defendant, and the minimal delay (six days) that would have resulted if

the motion for extension of time had been granted. *Meade,* 841 F.2d at 1520–21.

*Culpability of the litigant*

I have made a finding that Liberty Mutual willfully disobeyed this court's order of October 22, 1992. *Transcript of December 10, 1992 Hearing* at 14. I have also found that this willful behavior has continued until today. Although Liberty Mutual has been largely represented in this matter by outside counsel, a Liberty Mutual attorney has entered an appearance in this court and apparently has participated in overseeing some of the document productions in this case. *Liberty Mutual's Response* at 14. Therefore, I do not attempt to draw a distinction between the actions of counsel and the client. *See Ehrenhaus,* 965 F.2d at 921. Liberty Mutual is a sophisticated client and possesses ample ability to direct its attorneys and understand any repercussions of actions undertaken by its attorneys, at its direction or otherwise.

*Warning to litigant about a likely sanction*

Liberty Mutual has been warned twice, *see Transcript of October 22, 1992 Hearing* at 20 and *Transcript of November 5, 1992 Hearing* at 30, and has been sanctioned once, *see Transcript of December 10, 1992 Hearing* at 14. These measures have not proven to be sufficient to insure Liberty Mutual's cooperation with the court's order. Liberty Mutual has had an opportunity to review and respond to Coors' latest motion, which is the subject of this order. It has also had an opportunity to be heard and present its version of the facts of this discovery dispute. Therefore, I conclude that Liberty Mutual has had a sufficient warning and the requirements of due process have been satisfied. *See Ehrenhaus,* 965 F.2d at 921.

*Efficacy of lesser sanctions*

I have imposed monetary sanctions on Liberty Mutual to no avail. *Transcript of December 10, 1992 Hearing* at 14. Liberty Mutual has still not fully complied with this court's October 22, 1992, order. This is not an isolated instance of noncompliance. *Ocelot Oil Corp. v. Sparrow Industries,* 847 F.2d 1458, 1465 (10th Cir.1988) (remanding sanction issue to district court to make specific findings with regard to enumerated factors).

Liberty Mutual argues that the efficacy of the monetary sanction imposed by this court is demonstrated by "Liberty Mutual's counsel's repeated conferrals with Coors' counsel in efforts to satisfy Coors' discovery requests." *Liberty Mutual's Response* at 28–29. At some point "conferrals" need to stop and compliance needs to start. Harsher measures are clearly appropriate. Therefore, I find that precluding Liberty Mutual from raising the defense that it has no duty to defend Coors is an appropriate sanction.

On the basis of the foregoing findings and conclusions, it is therefore

**ORDERED** that Coors' motion for sanctions is **GRANTED.** Liberty Mutual is hereby precluded from asserting that it has *no* duty to defend, investigate or mitigate losses incurred by Coors at the Lowry Landfill in Colorado.